**JLS**

**18     0686**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

Eric Monroe Davis

_____

_____

*(In the space above enter the full name(s) of the plaintiff(s).)*

RECEIVED

FEB 15 2018

- against -

Allentown Police Dept.
Damian Murray (Det.)
Erik Landis (Det.)
individually and in their
official capacities

_____

_____

_____

_____

_____

*(In the space above enter the full name(s) of the defendant(s). If you
cannot fit the names of all of the defendants in the space provided,
please write "see attached" in the space above and attach an
additional sheet of paper with the full list of names. The names
listed in the above caption must be identical to those contained in
Part I. Addresses should not be included here.)*

**COMPLAINT**

under the
Civil Rights Act, 42 U.S.C. § 1983
(Prisoner Complaint)

Jury Trial: ☑ Yes   ☐ No
(check one)

**I.**   **Parties in this complaint:**

A.   List your name, identification number, and the name and address of your current place of
confinement.  Do the same for any additional plaintiffs named.  Attach additional sheets of paper
as necessary.

Plaintiff   Name   Eric Monroe Davis

ID #   MZ6900

Current Institution   S.C.I. Albion

Address   10745 Route 18

Albion, P.A. 16475-0002

B.      List all defendants' names, positions, places of employment, and the address where each defendant may be served. Make sure that the defendant(s) listed below are identical to those contained in the above caption. Attach additional sheets of paper as necessary.

Defendant No. 1        Name ALLENTOWN POLICE DEPT.   Shield #_____
                       Where Currently Employed _____
                       Address _____
                       _____

Defendant No. 2        Name DAMIAN MURRAY (DET.)   Shield #_____
                       Where Currently Employed _____
                       Address _____
                       _____

Defendant No. 3        Name ERIK LANDIS (DET.)   Shield #_____
                       Where Currently Employed _____
                       Address _____
                       _____

Defendant No. 4        Name _____ Shield #_____
                       Where Currently Employed _____
                       Address _____
                       _____

Defendant No. 5        Name _____ Shield #_____
                       Where Currently Employed _____
                       Address _____
                       _____

## II.    Statement of Claim:

State as briefly as possible the facts of your case. Describe how each of the defendants named in the caption of this complaint is involved in this action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Attach additional sheets of paper as necessary.

A.      In what institution did the events giving rise to your claim(s) occur?   N/A
_____

B.      Where in the institution did the events giving rise to your claim(s) occur?   N/A
_____

C.      What date and approximate time did the events giving rise to your claim(s) occur?   JUNE 2, 2016

| |
|---|
| What happened to you? |

D.   Facts: ON JUNE 3, 2016, PlaintiFP WAS arrested by the Reading Police Dept., on behalf of the Allentown Police Dept., For a warrant believed to be issued on JUNE 2, 2016. ONCE in the custody of the Reading Police Dept., Plaintiff was informed of his Right's and also informed of the charges against him. At that point, Plaintiff

| |
|---|
| Who did what? |

Requested a lawyer and signed Extradition PAPERS as to answer and defend against allegation set forth in the Allentown Police Dept. Criminal Complaint. Attached to the complaint is a fully copy of the AFFidavit OF Probable CAUSE, were DET. DAMIAN MURRAY and DET. ERIK Landis placed there

| |
|---|
| Was anyone else involved? |

name's as to "Being Duly Sworn According to the Law Depose and say that the Fact set Forth in the Foregoing AFFidavit are true and correct to the Best of my Knowledge, information and belief." Since Recieving discovery, which contained copy's of all interviews of witness and copy's of all testimony of

| |
|---|
| Who else saw what happened? |

witness, including grand jury testimony given to Plaintiff last (i.e. one week before trial) AFter Recieving a copy of the grand jury transcript's, Plaintiff and his assigned Attorney, ms Kathryn R. smith esq. were made aware that

III.    Injuries:

If you sustained injuries related to the events alleged above, describe them and state what medical treatment, if any, you required and received.  While OPERATING UNDRE the color of state law, Allentown Police Dept. DET. MURRAY and DET. Landis injuried me, the Plaintiff in this case, when both DET. MURRAY and DET. Landis FalsiFied Sworn documents (i.e. AFFidavit of Probable CAUSE) in order to FURther and SERCURE WARRANT FOR ARREST and Prosecution

IV.    Exhaustion of Administrative Remedies:

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that " [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a

prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Administrative remedies are also known as grievance procedures.

A.    Did your claim(s) arise while you were confined in a jail, prison, or other correctional facility?

Yes _____ No _✓_

If YES, name the jail, prison, or other correctional facility where you were confined at the time of the events giving rise to your claim(s).

_____

_____

B.    Does the jail, prison or other correctional facility where your claim(s) arose have a grievance procedure?

Yes _____ No _____ Do Not Know _✓_

C.    Does the grievance procedure at the jail, prison or other correctional facility where your claim(s) arose cover some or all of your claim(s)?

Yes _____ No _____ Do Not Know _✓_

If YES, which claim(s)? _____

D.    Did you file a grievance in the jail, prison, or other correctional facility where your claim(s) arose?

Yes _____ No _✓_

If NO, did you file a grievance about the events described in this complaint at any other jail, prison, or other correctional facility?

Yes _____ No _✓_

E.    If you did file a grievance, about the events described in this complaint, where did you file the grievance?              N/A
_____

1.    Which claim(s) in this complaint did you grieve? _____
                    N/A
_____

2.    What was the result, if any? _____
                    N/A
_____

3.    What steps, if any, did you take to appeal that decision? Describe all efforts to appeal to
the highest level of the grievance process. _____ N/A _____

_____

_____

_____

_____

F.    If you did not file a grievance:

     1.    If there are any reasons why you did not file a grievance, state them here: ___*N/A*___

                                _____

                                _____

                                _____

     2.    If you did not file a grievance but informed any officials of your claim, state who you
          informed, when and how, and their response, if any: ___*N/A*___

                                _____

                                _____

                                _____

G.    Please set forth any additional information that is relevant to the exhaustion of your administrative
     remedies. _____

     _____

     _____

     _____

     _____

     _____

**Note:**    You may attach as exhibits to this complaint any documents related to the exhaustion of your
            administrative remedies. *Exhibit-1 Criminal Conplaint / Affidavit*
                             *Exhibit-2 TaemaRe MeRcado testimony*
                             *Exhibit-3 Nikita Cespedes / Grand jury testimony*

**V.    Relief:**                          *Exhibit-4 Detective's Discovery Report*

State what you want the Court to do for you (including the amount of monetary compensation, if any, that
you are seeking and the basis for such amount). *Monetaar Compensation in the
amount of 10-million, for the violation of my constitutional's
Rights, the 9th, 5th, and 14th Amendment to the constitution*

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**VI.**    **Previous lawsuits:**

A.    Have you filed other lawsuits in state or federal court dealing with the same facts involved in this action?

On
these
claims

Yes ____ No __✓__

B.    If your answer to A is YES, describe each lawsuit by answering questions 1 through 7 below. (If there is more than one lawsuit, describe the additional lawsuits on another sheet of paper, using the same format. )

1.    Parties to the previous lawsuit:

Plaintiff _____

Defendants _____

2.    Court (if federal court, name the district; if state court, name the county) _____

3.    Docket or Index number _____

4.  Name of Judge assigned to your case _____

5.  Approximate date of filing lawsuit _____

6.  Is the case still pending?   Yes _____ No _____

    If NO, give the approximate date of disposition _____

7.  What was the result of the case? (For example: Was the case dismissed? Was there judgment in your favor? Was the case appealed?) _____
    _____
    _____

**On other claims**

C.  Have you filed other lawsuits in state or federal court?

    Yes _✓_ No ____

D.  If your answer to C is YES, describe each lawsuit by answering questions 1 through 7 below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, using the same format.)

    1.  Parties to the previous lawsuit:

        Plaintiff ERIC MONROE DAVIS
        Defendants TRACY KESTER, JANINE DONATE

    2.  Court (if federal court, name the district; if state court, name the county) 3RD EASTERN DISTRICT

    3.  Docket or Index number NO. 17-0021-JLS

    4.  Name of Judge assigned to your case JEFFREY L. Schmehl

    5.  Approximate date of filing lawsuit _____

    6.  Is the case still pending?   Yes _✓_ No ____

        If NO, give the approximate date of disposition _____

    7.  What was the result of the case? (For example: Was the case dismissed? Was there judgment in your favor? Was the case appealed?) _____
        _____
        _____

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this _11_ day of _JANUARY_ , 20 _18_.

                          Signature of Plaintiff _Eric Davis_

                          Inmate Number MZ6900

Institution Address   SCI AlBion
     10745 Route 18
     AlBion, P.A 16475-0002

Note:   All plaintiffs named in the caption of the complaint must date and sign the complaint and provide
    their inmate numbers and addresses.

I declare under penalty of perjury that on this __11__ day of __JANUARY__, 20 _18_, I am delivering
this complaint to prison authorities to be mailed to the Clerk's Office of the United States District Court for the
Eastern District of Pennsylvania.

Signature of Plaintiff: _____

Facts!

WITNESS 4#, that stated in Plaintiff Affidavit of Probable
Cause, did not comfirm statement, which was provided
independently by witness 3#. During discovery process,
Plaintiff came to know though assigned Attorney, who all
the witness are by name that were refered to in
Plaintiff's Affidavit of Probable Cause. Witness 4#,
came to be known A Nikita F. Cespedes, Witness
3#, came to be known as Taemare Mercado, Witness
2#, came to be known as Jody Silvia, and Witness
1#, came to be known as Candace Agudio. Now the rules
to requesting copy's of grand jury transcript's as
advised by my Attorney Ms. Kathryn R. Smith esq.,
is the Plaintiff and Plaintiff's Attorney is only allowed
copy's of grand jury transcript around or about the
start of trial.

   Once Plaintiff's Attorney was granted copy's of
grand jury transcripts that is when Plaintiff Attorney
and Plaintiff were made aware that witness 4#,
Nikita F. Cespedes did not comfirm that statement
which was provided independently by witness 3#,
Taemare Mercado, which by law is perjurie and made
plainly clear that Allentown Police Dept., ~~~~~ along
with Det. Murray and Det. Landis violated my 4th
Amendment Right, my 5th Amendment Right, and my

14th Amendment Right garentee by the Constitution of the United States of America

1    MR. BURD: Okay. Good morning everybody.

2    GRAND JURY: Good morning.

3    MR. BURD: Sorry for the delay this morning.
We had a witness coming in from Reading. Traffic was
awful, and it's one lane all down 222. They got

6  backed up. That was the reason for the delay. Thanks

7  for your patience.

8    All right, at this time let the record reflect

9  that it is 10:53 on April 29th, 2016, and this is the

10  Eighth Panel of the Lehigh County Investigating Grand

11  Jury, and it is hereby called to order.

12    This is Grand Jury Number 6 of 2015.

13    Foreperson, do we have a quorum to proceed at

14  this point?

15    FOREPERSON: Yes, we do. We have 18

16  permanent members and nine alternate members present.

17    MR. BURD: Thank you very much, sir.

18    All right, at this time the Commonwealth will be

19  calling Nikita Cespedes.

20    **(Whereupon, NIKITA CESPEDES, having first**

21  **been duly sworn, was examined and testified as**

22  **follows.)**

23    * * *

24    **EXAMINATION**

25  **BY MR. BURD:**

---

4

1  **Q**    Just one thing preliminarily here. First off,

2  I'm going to give you checks, one for your witness

3  appearance and one for travel expenses. That is yours

4  to keep. And I just ask you to sign this paper

5  acknowledging that you're appearing before the Grand

6  Jury.

7  **A**    (Complying.)

8  **Q**    Thank you very much.

9  **A**    You're welcome.

10  **Q**    All right. Could we start off, ma'am, would

11  you please tell the ladies and gentlemen your name and

12  then spell your name so that the record is clear?

13  **A**    **The whole thing?**

14  **Q**    Yes, please.

15  **A**    **My name is Nikita F. Jackson (as spoken.) My**

16  **name is spelled N-i-k-i-t-a, F for Faith, F-a-i-t-h;**

17  **Cespedes, C-e-s-p-e-d-e-s?**

18  **Q**    And what is your date of birth, ma'am?

19  **A**    **February 18th, 1981.**

20  **Q**    And that makes you how old today?

21  **A**    **Thirty-five.**

22  **Q**    And where is it that you live?

23  **A**    **Now?**

24  **Q**    Yes.

25  **A**    **At 611 Pear Street, Reading, PA, 19601.**

---

1  **Q**    Okay. How long have you lived there?

2  **A**    **On and off for 12 years.**

3  **Q**    Okay. And did you have -- you lived other

4  places in the last several years?

5  **A**    **Yeah.**

6  **Q**    Where else have you lived?

7  **A**    **I lived here in Allentown on Turner Street. I**

8  **lived on -- here in Allentown on 14th Street, and I**

9  **lived in a couple other places in Reading, a lot of**

10  **different places.**

11  **Q**    So you've mostly been back and forth from

12  Allentown and Reading -- between Allentown and

13  Reading?

14  **A**    **Yeah.**

15  **Q**    Do you have family here in Allentown?

16  **A**    **No, not anymore.**

17  **Q**    Did you at some time?

18  **A**    **Yeah. My father lived here on Turner Street**

19  **for maybe 20 years, and then he moved away.**

20  **Q**    Okay. And do you have family in Reading also?

21  **A**    **Everybody in my family lives in Reading. We're**

22  **from there.**

23  **Q**    Okay. And tell me a little bit about your

24  family. Your father, is your father still living?

25  **A**    **Yeah, my biological father is still living. He**

---

6

1  **lives in California.**

2  **Q**    Okay.

3  **A**    **My father that I had living here was a man who**

4  **was married to my mother for all of my youth life.**

5  **Q**    Okay. Where is your mom at?

6  **A**    **My mom is home right now taking care of my**

7  **children.**

8  **Q**    Okay. And you have, how many children do you

9  have?

10  **A**    **Five.**

11  **Q**    And what are their ages?

12  **A**    **18, 16, 10, 8 and 16 days.**

13  **Q**    Congratulations.

14  **A**    **Thank you.**

15  **Q**    You've got your hands full.

16    Are you currently going to school or working?

17  **A**    **Currently, in a, like a, what they would call**

18  **an assistant program through something called Berks**

19  **Counseling Center. It's a dual diagnosis center for**

20  **drugs and alcohol, and also for mental issues.**

21  **Q**    Okay.

22  **A**    **I go to school through them so to get me like**

23  **parenting, like housing assistance, job training, all**

24  **that stuff, and then to help me with my parenting and**

25  **my mental health care, to help me get my life on the**

9

1  straight and narrow basically.
2  Q      That's wonderful.  So how many days a week?
3  What sort of commitment is that time wise for you?
4  A      I go there for the -- for dual diagnosis, I go
5  twice a week, and then for -- I'm going to miss the
6  program.  I be missing it right now to come here.
7  That's my parenting class.
8  Q      Sorry.  Do you drive a car?
9  A      No.
10 Q      Do you have a license?
11 A      Yeah.
12 Q      You just don't have a car right now?
13 A      Yeah, I don't have a car right now.
14 Q      Okay.  Do you have a cellphone?
15 A      Yeah, but my cellphone works through like
16 Wi-Fi, and I can't really afford to pay the bill.
17 Q      Okay.  Now, I want to go back and talk about
18 the time around December 9th of 2014.
19 A      Okay.
20 Q      Where were you living at that time?  Were you
21 in Reading or Allentown?
22 A      In Allentown.  2014?
23 Q      Yep.
24 A      In Allentown.
25 Q      What was the address you were living at then?

1  Allentown.  You have a lot of friends in the Reading
2  area.  Would that be fair to say?
3  A      Yeah, that'd be fair to say.
4  Q      And do you have a Facebook account?
5  A      Yeah, of course.
6  Q      And do you go by a different name than Nikita
7  on your Facebook account?
8  A      Yeah.
9  Q      What name do you go by?
10 A      Nore.
11 Q      How do you spell that?
12 A      N-o-r-e.
13 Q      N-o-r-e?
14 A      Mm-hmm.
15 Q      Do people know -- is that a common nickname
16 that people know you by?  Like, would somebody call
17 you that?
18 A      No, it's something that somebody that I used to
19 deal with in New York made up for me.  Nobody in
20 Reading calls me that.  I'm always known by Nikita or
21 Kita.  I lived there all my life, so, and nobody
22 really knows me by that.
23 Q      All right.  And are you familiar with a
24 gentleman named Tai-Mare Mercado.
25 A      Yes, I am.

8

1  A      212 or 214.  I can't remember the exact -- on
2  14th Street.  On the top of a building of a store on
3  the corner of 14th and Turner.
4  Q      Okay.
5  A      I think it was 214 or 212.
6  Q      212.  Great memory.  And who was living with
7  you there at that residence at that time?
8  A      At the time, me, my ten-year-old daughter
9  Brooklyn, she was eight at the time; my eight-year-old
10 son, who was six at the time, and my husband Alberto.
11 Q      And did you have a cellphone at that time?
12 A      Yeah.
13 Q      And was that cellphone number 484-387-3073?
14 A      I had like four numbers in between there.  It
15 might have been.  I'm not exactly 100 percent sure.
16 Q      Okay.  Yeah, I wouldn't expect you to remember
17 the exact number.
18         Do you recall speaking with the detectives in
19 2015 about a cellphone number?
20 A      Yeah, I do.
21 Q      Okay.  And if they said that was the number
22 that you had at that time, do you have any reason to
23 disbelieve that?
24 A      No.  I mean, not really, no.
25 Q      Okay.  So, obviously, you're living here in

10

1  Q      And is there a name that you call him by or is
2  there a nickname for him?
3  A      No.  Everybody just calls him Tai-Mare.  That's
4  his name.
5  Q      Okay.  How do you know Tai-Mare?
6  A      His mother has children by my uncle, and he is
7  kind of my cousin, but he's not biologically my
8  cousin, but we say we're family actually.  We call
9  each other brother and sister actually.
10 Q      And so how long have you known him then?
11 A      All of our lives.
12 Q      Where was he living in December of '14?
13 A      In Reading, I guess.  I have no idea.
14 Q      Did you have regular contact with him around
15 that time?
16 A      No, not regular contact, but I had some contact
17 with him at the time.  And then, all of my life, in
18 and out of contact.
19 Q      Okay.  And would that be by phone or did you
20 see him face-to-face?
21 A      It just -- however.  Um, sometimes see him,
22 sometimes by phone, sometimes in passing.  Whenever.
23 Reading is a small town so everybody pretty much sees
24 and knows everybody.
25 Q      And did you know Jose Carrero?

```
 1    A     I don't know him by that name, but if you're
 2   talking about the victim in the case, he didn't go by
 3   that.
      Q     What did he go by?
      A     They called him Tito.
 6    Q     They called him Tito.  That's what you called
 7   him?
 8    A     Mm-hmm.
 9    Q     Then you knew him?
10    A     I knew -- yeah, I knew him in the way of --
11   yeah, he's a hustler so, yeah, I knew him, but not
12   known him well.
13    Q     What do you mean by "a hustler"?
14    A     I mean I knew him as far as like I used to get
15   things from him, but I didn't know him as far as like
16   he could be a friend of mine, or I don't know him the
17   way I know Taye, let's just say that.
18    Q     Okay.  You and Taye are basically family, like
19   you said?
20    A     Mm-hmm.
21    Q     Tito, would you say yours and Tito's
22   relationship would be more of a business --
23    A     Yeah.
24    Q     -- type of thing?
25    A     Of course.  Yep.
```

```
                                                          12
 1    Q     And what are we talking about?  You said you
 2   would get things from him?
 3    A     Yeah.  At the time I was an avid user of K2, so
 4   I used to buy K from him a lot.
 5    Q     I think it's fairly common knowledge at this
 6   point, but just in case anyone doesn't know, what
 7   exactly is K2?
 8    A     It's the synthetic weed.
 9    Q     And is he a person who is known to sell K2?
10    A     Yeah.  Everybody in Allentown knew it.
11    Q     And how is it that you would when you -- let's
12   say you wanted to get some K2, how would you go about
13   getting that from Tito?
14    A     I would text him, call him or walk down to his
15   garage and see him.
16    Q     All right.  And did they always -- did he
17   always have some?
18    A     Yeah, most of the time, I guess.  I mean, if I
19   didn't see him, I would see one of his other peoples
20   or send somebody else, or whatever.  It, just --
21   however it just came about that day.
22    Q     Sure.  And he had people.  Did he actually have
23   people working for him?
24    A     I don't know if they were working for him.  I
25   don't know that.  I just know at times I would meet
```

```
 1   other people.
 2    Q     Okay.  And then you said "his people" though.
 3    A     Yeah, his people that I know through him, but I
 4   can't say they were working for him.  I don't know
 5   that.  I just know that he would send sometimes other
 6   people or I would walk down to the garage and other
 7   people would be there.  It wasn't always him.
 8    Q     Okay.  And the garage, that was at his house?
 9    A     No, it was actually down from where I stayed.
10   I stayed -- there was a park where I stayed on the
11   corner, and if you would walk down a little street,
12   it's like an alleyway street, and if you go down some
13   more, like maybe two -- two -- one -- two streets
14   down, there was a garage there where they used to fix
15   cars, and we would go there and meet them.
16    Q     Okay.  And you knew where his house was too,
17   right, over on Pine Street?
18    A     No, I didn't know where his house was on Pine
19   Street.
20    Q     You didn't know where his house was?  Do you
21   remember talking to the detectives back in 2015?
22    A     Yeah.  I had knowledge of it, but I never been
23   at that house before.  I know that -- like I told them
24   back then, I used to meet him at the garage or he
25   would come.  He always had a way to come to see us.
```

```
                                                          14
 1   He always had cars and would always come to deliver.
 2   I never really had a reason to go to his house.
 3    Q     Sure.  Oh, I'm not necessarily suggesting you
 4   had been to his house, but you knew where it was?
 5    A     Everybody knew.
 6    Q     Mm-hmm.  And how often do you suppose you would
 7   buy from him?
 8    A     A lot.  Like every day, every other day, or not
 9   even -- it might not be me directly buying from him
10   but somebody I might be with or a friend of mine, or
11   somebody else.  You know, like if I'm with my home
12   girl or a friend of mine, they might be getting it
13   from him, but it was often.
14    Q     Right.  Because sometimes one person would buy
15   one day and then you would share?
16    A     Right, right, exactly.
17    Q     Okay.  How much does K2 cost?
18    A     Now I have no idea, but then it was $10.
19    Q     $10.  How much does that get you?
20    A     Like you get a whole pack for -- but, see, it's
21   so different the way they sell it now, but back then,
22   it was like a pack that you would get like probably
23   about this big, and it would be like different names
24   of it, or.
25    Q     Does it look like a tobacco package or
```

**Page 15**

1  something like a sealed package?

2  A    No.  Like, I would say like -- like maybe like

3  sometimes they have a package like that, but it would

4  have like a Ziploc seal on the top of it, something

5  like that, but it wasn't like a home packaged product.

6  It was more like something you buy in a store.

7  Q    Okay.  Like actually a manufactured packaged

8  product?

9  A    Mm-hmm.

10  Q    Okay.  Thank you.  What about Shane Kinchen, do

11  you know Shane Kinchen?

12  A    No.

13  Q    Do you know Animal?

14  A    No.  I know of him, but I don't know him.

15  Q    You know of him.  How do you know of him?

16  A    Everybody knows who everybody is.

17  Q    Is he a friend of Tai-Mare's?

18  A    I don't know.

19  Q    You don't know if he and Tai-Mare ever hung

20  out?

21  A    No, I don't know if they ever hung out.  I know

22  that they might know each other, but I don't know, as

23  far as like our personal dealings, no.

24  Q    Well, you know that they might know each other.

25  What does that mean, "that you know," but you just

**Page 16**

1  didn't get involved with them together?

2  A    Yeah, like -- like I never was encounter with

3  them together, but if they knew each other, then that

4  was on their own terms, not on my terms.

5  Q    I understand that.  I'm not trying to trick you

6  in anything here, but you know through Tai-Mare that

7  they knew each other?

8  A    No, I don't know through Tai-Mare if they knew

9  each other.  I know that in Reading, everybody knows

10  everybody.  Everybody knows everybody.  That's how it

11  is.  I might not know somebody directly, but I might

12  know -- like, if I don't know you directly, I might

13  know your cousin, who knows you, or like somebody who

14  hangs out.  It's a small town.  Everybody knows

15  everybody.  So you might be -- I might be with

16  somebody one day but be with a different set of people

17  another time.  It's always like that.

18  Q    All right.  Well, Mr. Kinchen had your phone

19  number in his phone, right?

20  A    Mm-hmm, from what I heard from the detectives.

21  Q    Well, you didn't have to hear that from the

22  detectives.  You called him.  Didn't you call him?

23  A    I told the detectives, like I told them before,

24  I was calling Taye on that number.  I didn't know

25  whose number it was that Taye was calling me from, but

**Page 17**

1  he was trying to contact me, and I was trying to

2  contact him, and that's the number that I was

3  contacting him, me and him back and forth on.

4  Q    All right.  But the detectives found Tai-Mare

5  had his own phone that the detectives found.

6  A    If he did, he wasn't calling me on that number.

7  Q    He wasn't calling you on his own phone?

8  A    No.  If he did have his own phone, I didn't

9  have that number.  I had the number that he was

10  contacting me on, which I learned from them, was the

11  person Animal's phone number.

12  Q    But you knew Tai-Mare, and you must have had a

13  regular phone number for him; did you not?

14  A    No, I didn't, no.  He's not a person that would

15  have a regular phone number.

16  Q    Okay.  Why not?

17  A    Just things that he did, that wasn't part of

18  his personality.  He might have had a number one

19  minute and not have that number in days, or have one

20  -- or call me from a girl's phone or in-boxing, on

21  Facebook, or calling him on one number, and I'll call

22  that number and it's some girl's number or somebody

23  else's number, and then they'll say, "Oh, no."  But

24  he's calling me off this phone.  And that's the kind

25  of person that he was.  He's always -- I'm pretty sure

**Page 18**

1  you all got his jacket, so I'm pretty sure you all

2  know what kind of person that he is, so him keeping a

3  regular number on a regular basis, no.

4  Q    All right.  And I think what you're saying is

5  Tai-Mare is the kind of guy that's involved in some

6  things that maybe aren't exactly aboveboard.

7  A    Yeah, I guess so.

8  Q    And it would be beneficial for a person like

9  that not to have a regular phone number.

10  A    Exactly.

11  Q    Right.  Because then you kind of get locked

12  down?

13  A    Exactly.

14  Q    I understand.  All right.  So the night we're

15  talking about, and this is the early morning hours of

16  December 9th, there's a lot of calls --

17  A    Mm-hmm.

18  Q    -- between your number and this other number,

19  which is actually Mr. Kinchen's phone, but what were

20  you guys talking about?

21  A    Actually, like I told the detectives before, he

22  was supposed to be coming to meet me, him and this

23  girl named Kiona, but they never showed.  And then I

24  kept trying to get in contact with him, but in between

25  the meantime, I just took the kids and went to bed

21

1    be like the nicest person when you are, like, around
2    him, and you know, he's like regular, just regular,
3    when he's around.  You know, he don't talk about the
4    streets kind of thing.  And my mom loves him.  And
5    then you hear things and you're like, holy, you know,
6    --
7    Q       Mm-hmm.
8    A       -- he couldn't be that kind of person.  But the
9    things that you hear and the things that he's been
10   arrested for, then you like, oh, this got to be, like,
11   true because he's arrested for it, you know, or he's
12   in trouble for it, or you hear it on the news, or you
13   see it in the newspaper.  It's not like it's a secret.
14   Q       So almost like a Dr. Jekyll/Mr. Hyde kind of
15   thing?
16   A       Yeah, because my kids love him, and he's good
17   to my kids, and he's very polite around my family, and
18   never like the kind of person that they portray him to
19   be in the streets and not the kind of person that he
20   is around us.  That's how I could say.
21   Q       Okay.  So you said something about going to bed
22   waiting for him that night, talking about December 8th
23   into the 9th of 2014.
24   A       Mm-hmm.
25   Q       Tell me in particular the best you can remember

---

20

1    A       What do you mean?
2    Q       Well, if you were going to run in on somebody,
3    particularly someone involved in the drug trade, you
4    probably wouldn't do that on your own, right?
5    A       That would be something that I would never do.
6    Q       I don't mean you.  I mean "you" as in a person
7    that would do that.  You would work with other people,
8    you heard that on the street as well?
9    A       Who, me or him?
10   Q       Him.  When he would do his, well, let's call
11   them "jobs."
12   A       Like I said, I really -- like I -- it's -- it's
13   -- it's well known in our town that he gets into some
14   situations that I'm not particularly fond of, but, I
15   mean, I hear things, but everybody hears things, and
16   he's just somebody that you'd rather just stay away
17   from.  That's all I can say.
18   Q       I understand.  And your relationship with him
19   didn't have anything to do with that; is that what
20   you're saying?
21   A       Nah, because like Taye is -- how can I say
22   this -- he's not like that around me and my kids.  You
23   know, he don't bring that kind of activity.  Even
24   around my mom, he -- how can I say it -- he's like a
25   jack of all trades, and like, as far as like, he could

---

1    because he never showed up.
2           I called him back when I woke up in the in
3    between, and he still didn't show up.  So I just kind
4    of gave up on him because he always, as the word goes,
5    he's always dubbing me on something.  So I'm used to
6    that with him.
7    Q       All right.  And some of the things, I should
8    say, Tai-Mare was in involved in -- I don't know what
9    you want to call it, but let's call it unsavory
10   activities, okay?
11   A       Okay.
12   Q       Was one of those things that they would rob
13   drug dealers?
14   A       I don't know.
15   Q       You never heard him talk about doing that?
16   A       I never heard him talking about it, but I heard
17   the streets talking about it.
18   Q       Is it something that you kind of, at least,
19   suspected he was involved in?
20   A       I can't say I suspected it, but everybody
21   suspected it.  It's known in our town that he does
22   things like that, but as far as me as personal
23   knowledge, no, I don't know that.
24   Q       Okay.  And you wouldn't normally do something
25   like that by yourself, right?

---

22

1    what you were doing that night.
2    A       I was just hanging out with the kids like I
3    always did.  Kicking it with the kids.  I really don't
4    -- I mean, I used to do my thing as far as like
5    smoking, but I really wasn't a hangout kind of person
6    so I never really was hanging out.  I got kids.  I was
7    just home with the kids.
8    Q       Okay.  But then, you know, what time do the
9    kids go to bed?
10   A       Oh, we -- I ain't going to lie.  They stay up
11   pretty late sometimes depending on what we're doing.
12   Q       Right.  What do you think that night, do you
13   have any idea?  What would be usual?
14   A       I don't know.  It might have been 11:00, 12
15   o'clock when the kids went to bed, but then I remember
16   my son was in and out of sleep because he wasn't
17   feeling good.  He was having a problem with his belly,
18   and then he -- he was just going back and forth, but,
19   you know, they weren't up that late.  They're little
20   at that time.  I mean, they're still young, but at
21   that time they were little.
22   Q       Right, because we have -- you know, there are
23   phone calls between you and this other phone up to
24   4:00 in the morning?
25   A       Right.  No, they weren't -- no, they weren't

23

1  awake.
2  Q     Okay.  So you weren't hanging with the kids the
3  whole time?
4  A     No, but they were sleeping in my room with me
5  because like a week before that, this ceiling in my
6  kids' room had fell, so they were sleeping in my room
7  with me.
8  Q     Okay.  And you didn't see Tai-Mare at any time
9  that night?
10  A     No.
11  Q     All right.  Well, we've already heard in here
12  that the car he was driving that night had a GPS in
13  it.
14  A     They told me that before too.
15  Q     You were told that?
16  A     They told me.
17  Q     Yeah.  And you know where the GPS showed up at?
18  A     They said that it was in the vicinity of my
19  home.  And I told them, just like I will tell you, if
20  they were out there or they were knocking for me, I
21  never seen anybody.  I didn't come down.  I didn't see
22  Taye.  I didn't talk to him that day at all as far as
23  like face-to-face.
24  Q     Okay.  So Taye, who's like a brother to you, --
25  A     Right.

24

1  Q     -- drives into Allentown in the early morning
2  hours after midnight.
3  A     I don't know that he ever came to Allentown.
4  Q     Well, we do know, because we know where the car
5  was.
6  A     From what I understand, that wasn't his car.
7  Q     Parked in the -- the car that we can put him in
8  was parked in the 200-block of North 14th Street.  So
9  he drove into Allentown in the middle of the night,
10  parked on your block, and you didn't see him.  Is that
11  what you're telling us here today?
12  A     I didn't see him.
13  Q     You're under oath here.
14  A     And I'm telling you that I didn't see him.
15  Q     Okay.  And it wasn't for lack of effort because
16  you had phone contact, right, you called him?
17  A     Yeah, lots of times.  I told them that.  I was
18  trying to get in touch with him all of that night.
19       I'm not the only person in Allentown that Taye
20  knows.
21  Q     I'm not suggesting you are.  He knows a lot of
22  people on your block?
23  A     No, I'm not saying he knows a lot of people.
24  And like I said, even if they made it over there, that
25  doesn't mean that he saw me or I saw him.  I didn't

25

1  see him.
2  Q     All right.  When was the next time you talked
3  to him then?
4  A     Not until probably weeks when I moved back into
5  Reading.  I had got evicted from that apartment, and I
6  ended up moving back to Reading.  Because me and my
7  husband ended up splitting, and then I got evicted
8  from that apartment, and I ended up going back to
9  Reading because I didn't have a place to live.
10       Like, I'm not from Allentown so I really didn't
11  have like a place that would take me and my kids and
12  let us live there.  Trust me, I tried.  I didn't want
13  to go back to Reading because Reading is not a place
14  you want to be with your kids, but I had ended going
15  back.
16  Q     Okay.  And did Tai-Mare smoke K2 as well?
17  A     Not that I -- not to my knowledge that he did.
18  Q     But he knew that you smoked, right?
19  A     Um, I'm not going to say that either.  I kind
20  of was trying to keep the K2 thing under wraps because
21  that was kind of like a judgey kind of thing.  You
22  know, people used to be, that was like quote, unquote,
23  new crack, you know.  And I didn't want a lot of
24  people to know that I was smoking hay like that,
25  especially not people from where I was from,

26

1  especially not people that could be involved with my
2  mom or my peoples or anything like that.  I didn't
3  want people to know that at all.
4  Q     But, you know, you smoked with your girlfriends
5  and stuff?
6  A     But not -- but with people from out here.
7  Q     Okay.  Just one moment, please.  I want to
8  speak with the detectives for a moment.
9  A     Okay.
10       (Whereupon, an off-the-record discussion was
11  held among Attorney Burd and Detectives Salgado,
12  Murray and Landis.)
13  BY MR. BURD:
14  Q     I just have one more question.
15  A     Okay.
16  Q     I asked you about a couple of people if you
17  know them.  Do you know Eric Davis?
18  A     No.
19  Q     You never met Eric Davis, don't know about him?
20  A     No.
21  Q     He's from Reading.
22  A     If he is, I don't know him.
23  Q     Okay.  But, I thought everybody knows everybody
24  from Reading.
25  A     No.  But, I'm just saying, if he is, I just --

**27**

1    maybe in passing or maybe if I seen him by face, but
2    just to say the name, no.
3    Q        One moment. Eric Davis. It's not the greatest
        picture in the world. (Indicating a photograph.)
4    A        Oh, yeah, I know E.
6    Q        You know E. You know him as E, not as Eric
7    Davis?
8    A        Yeah.
9    Q        Okay. How do you know Eric?
10   A        I know him in passing. He used to be with a
11   guy that I used to date.
12   Q        How about this person? (Indicating a
13   photograph.)
14   A        I told you I know him. His name is right on at
15   the bottom. But I don't know him.
16   Q        You don't know the face?
17   A        No, I know his face. I don't know him though.
18   Q        Okay. All right. Nikita, what I'm going to
19   ask you to do now is just step outside where you were
20   waiting.
21   A        Should I leave my stuff here?
22   Q        Yeah. I'm going to confer with the ladies and
23   gentlemen. They may have additional questions for
24   you. Then I'll bring you back in. Okay?
25   A        Okay.

**28**

1    Q        Thank you.
2    A        Thank you.
3            (Whereupon, the witness exited the Grand
4    Jury Room.)
5            MR. BURD: Okay. Question? Go ahead.
6            JUROR NO. 7: Number 7. I'm not sure if you
7    asked her or you didn't get an answer or we haven't
8    asked her. What was the reason that she was calling
9    Tai-Mare Mercado that night? Do we know? Does it
10   matter?
11           MR. BURD: I thought she said she was trying
12   to see if they were going to meet up that night.
13           JUROR NO. 7: That was the only reason that
14   she gave?
15           MR. BURD: That's what she said.
16           JUROR NO. 7: Thank you.
17           MR. BURD: Okay.
18           JUROR NO. 6: Number 6. I had a somewhat
19   similar question. When she did actually talk to him
20   later, did he ever tell her why he was calling her at
21   1:00, 2:00, 3:00 in morning?
22           MR. BURD: Well, I think she was calling
23   him.
24           JUROR NO. 6: Oh.
25           MR. BURD: I'll ask a little bit more in

**29**

1    that area. Let me just write that down because I'll
2    forget. What was the last bit, what did he say when
3    she finally talked to him?
4            JUROR NO. 6: Yeah, why he was trying to get
5    in touch with her, again, that late at night. You
6    know, if he blew her off, why wouldn't he be calling
7    at 2:00, 3:00, 4 o'clock at night? Did they ever
8    actually make contact, verbal contact, that night on
9    the phone?
10           DETECTIVE MURRAY: I'm not sure of the
11   duration of the calls, but they went back and forth.
12   I'm not 100 percent sure off the top of my head how
13   long the calls were.
14           JUROR NO. 6: Okay.
15           MR. BURD: Yes, sir.
16           JUROR NO. 3: Juror Number 3. Tai-Mare was
17   going down to bring -- or he was bringing a girl over,
18   but I don't think she made it clear whether like she
19   had a personal connection with that girl or were
20   friends. I don't even know what her name was. She
21   kind of said that she brought Kiona with her. Like I
22   don't know if they were personal friends or what was
23   the specified reason that they were coming down, just
24   to hang out, I guess, or.
25           MR. BURD: Okay.

**30**

1    Anybody else? Sir.
2            JUROR NO. 28: Juror 28. She knows Sean
3    Davis in passing?
4            MR. BURD: Sean Kinchen. Eric Davis.
5            JUROR NO. 28: You showed her two people.
6            MR. BURD: I showed her Eric Davis and Sean
7    Kinchen.
8            JUROR NO. 28: Both of them she kind of
9    knows in passing. Who was she with when she happened
10   to meet those people? I mean, how does she know them
11   in passing?
12           MR. BURD: Okay. Sure.
13           JUROR NO. 21: 21. I'm confused on that
14   night with the phone calls back and forth. Did they
15   actually make phone contact?
16           MR. BURD: I'll ask her that, sir. We're
17   not sure. That was asked previously. We don't have
18   the call logs with us right now to show the duration
19   of the calls. We can make a note that we can cover
20   that at a later date. And I'll ask her now too.
21           Anyone else?
22           JUROR NO. 22: Juror 22. Were the phone
23   calls back and forth, was she making the call or was
24   he making the call?
25           MR. BURD: I'm going to ask her that again.

JUROR NO. 11: Juror Number 11. She had
said that she didn't -- she wasn't aware that Tai-Mare
-- is that his name?

MR. BURD: Tai-Mare.

JUROR NO. 11: She wasn't aware that his
vehicle was in front of her home and she was in the
bedroom with her children. But, my question is: She
didn't look out the window or anything like that? She
really didn't see anything outside? I mean, if
they're in one room, I would assume if she was up all
night making these phone calls, she would look out the
window or whatever.

MR. BURD: Right.

JUROR NO. 11: So I don't know.

MR. BURD: It's not really a question. It
is what it is. That's a credibility determination, if
that makes sense.

JUROR NO. 11: I was wondering if she looked
out the window or anything like that.

MR. BURD: Okay. She's going to say no,
but. We're all wondering about that because it
doesn't make any sense.

JUROR NO. 11: I know.

MR. BURD: So. Yes, sir.

JUROR NO. 25: Juror 25. Just curious if

32

she was a friend with Eric's girlfriend, if they had
any conversations at all about anything going on.

MR. BURD: Okay.

JUROR NO. 33: 33. Does she know why
Tai-Mare was coming into Allentown?

MR. BURD: Yes. Somebody asked that. I'll
ask her.

JUROR NO. 33: All right.
Sir.

JUROR NO. 36: Does she know where Pine
Street is in Allentown? I mean, she hasn't been to
the house but does she know where it is?

MR. BURD: Yeah, I think she said everybody
knew where his house was.
Anyone else? Last call.
Okay.

(Whereupon, there was a delay in the witness
returning into the Grand Jury Room.)

MR. BURD: Yes, sir.

JUROR NO. 28: May I ask one more question?

MR. BURD: Sure.

JUROR NO. 28: Did she smoke K2 with
Tai-Mare or does she know if Tai-Mare smoked K2?

MR. BURD: I thought she said she hid that
part of her life from him.

JUROR NO. 6: I have one more question.
Number 6. Do we know how long the car was sitting
there based on the GPS?

DETECTIVE MURRAY: No. If I can explain
that. With Ping we don't know how long it was there,
but we put it there around 2:30 in the morning.

JUROR NO. 37: I just wanted to know --
Number 37 -- the distance between Pine Street and 14th
and Turner.

MR. BURD: I'll let you know as soon as they
come in.

DETECTIVE SALGADO: Four and-a-half blocks.
It'd be about four and-a-half blocks west heading
towards the Fairgrounds. That big cemetery there on
Tenth Street is between there and where 12th Street is
and then two blocks further west is where her house is
because Pine Street is just north of Chew Street.

JUROR NO. 25: May I ask a question?

MR. BURD: Sure.

JUROR NO. 25: Number 25. The last time we
were here the testimony said Taye was the one that was
too bitch to go in the house; is that correct?

MR. BURD: Correct.

JUROR NO. 25: And he was supposedly hung up
with some girl?

34

MR. BURD: On the phone, yeah.

JUROR NO. 25: Is this Kiona or her?

MR. BURD: Well, we think it was her.

JUROR NO. 38: Number 38. So there was no
girl in the car?

MR. BURD: I'm not 100 percent sure, but we
don't think so.

JUROR NO. 38: Oh, I thought he was too
bitch because he was there with a girl in the car.

MR. BURD: We don't know exactly. It was
either that or on the phone. It wouldn't make sense
to be calling if she was in the car.

JUROR NO. 38: Yeah.

MR. BURD: Sorry folks. Just hang tight. I
think this will be it for the day.
Is that right?

MR. RECTOR: Yes, sir.

MR. BURD: Okay. Just bear with us.

JUROR NO. 9: Juror 9. Would you ask her if
she knows the name Morales? He also said when he was
here that he was using Jose Carrero's car, so if they
can identify him by a car, she knew that if he let
people use his car, then maybe she could follow him
instead.

MR. BURD: I'm sorry. I don't follow.

35

1    JUROR NO. 9:  Say if she can identify his
2  car, she knew he leant his car out to people or locate
3  the home since he drives his vehicle.  You know, maybe
4  they followed.  Remember, he said he got there 3:00 in
5  the morning?
6    MR. BURD:  Yeah.
7    JUROR NO. 9:  Maybe followed them to the
8  home.
9    MR. BURD:  I'm still missing the point.
10  They followed his car there the night of the robbery,
11  you mean?
12    JUROR NO. 9:  When Jose Morales was here, he
13  said that Mr. Carrero had let him use his vehicle.
14    MR. BURD:  Yes.
15    JUROR NO.  So maybe she knew the vehicle.
16  She said that she knew everyone in the household.  Ask
17  if she knows what kind of vehicle he drives.
18    MR. BURD:  Okay.
19    JUROR NO. 9:  Or if she knows Mr. Morales.
20    MR. BURD:  Okay.
21    JUROR NO. 25:  25.  Just curious.  We know
22  that the GPS picked him up at the 200-block that
23  night, and I think the Ping was once every
24  15 minutes --
25    MR. BURD:  25 hours.

36

1    JUROR NO. 25:  Once every 25 hours.  Okay,
2  so it just happened to Ping at that time when he was
3  there?
4    MR. BURD:  Mm-hmm.
5    JUROR NO. 25:  So we have no idea how long
6  he was there.
7    MR. BURD:  No.  It's just a moment in time.
8  At 2:30 a.m. on December 9th, that car was parked in
9  the 200-block of North 14th Street.
10    DETECTIVE MURRAY:  Or two o'clock.
11    DETECTIVE LANDIS:  Give me a minute.
12    MR. BURD:  Yeah, sure.
13    And that business is no longer in business.  We
14  have the GPS.
15    (Whereupon, the witness entered the Grand
16  Jury Room.)
17  BY MR. BURD:
18  Q    Hi.  Thanks for coming back.
19    The ladies and gentlemen just had a couple
20  questions about a few points.
21  A    Okay.
22  Q    During the phone calls between you and Tai-Mare
23  that night, did you guys actually make contact and
24  speak to each other?
25  A    Yeah.

37

1  Q    And were you calling him, and he was calling
2  you back?
3  A    Yes.
4  Q    And when you finally did talk to him, did he
5  ever mention why you didn't meet up that night?
6  A    He didn't mention why.
7  Q    Did he ever tell you when you were talking to
8  him that night where he was or why he couldn't come
9  over?
10  A    No.
11  Q    And he was supposed to bring Kiona over.  Is
12  that a friend of yours?
13  A    No, that's a friend of his.
14  Q    Have you ever met her before?
15  A    Yeah, I met her a lot of times.
16  Q    And do you know Candice Agudio, E's girlfriend?
17  Did you ever meet E's girlfriend?
18  A    No.  Like, I can't recall the name, no.
19  Q    All right.  How about Jose Morales, did you
20  know Jose Morales?
21  A    That's the person who was a victim in the case?
22  Q    No, that's Tito's brother.  Is that his
23  brother?
24    DETECTIVE MURRAY:  No, just cousinish.
25  A    If I -- probably, like he might be one of the

38

1  guys that I was telling you about, that I might have
2  seen him.
3    MR. BURD:  I don't know if I have a picture.
4    DETECTIVE LANDIS:  There's one in there.
5    MR. BURD:  Do you have one?  Okay.
6  (Indicating a photograph.)
7  BY MR. BURD:
8  Q    And this is the gentleman on the bottom
9  picture.  Do you know him?
10  A    Oh, no.
11  Q    It's not Tito?
12  A    No, I don't know the guy on the bottom.
13  Q    Okay.  He's not one of Tito's guys; you never
14  bought from him or anything like that?
15  A    No.  I know another boy that has long hair with
16  glasses that was his friend.
17  Q    Did Tai-Mare ever tell you that he was in
18  Allentown around the time of the homicide?
19  A    No.
20  Q    All right.  So that night you said initially
21  you didn't have any contact with Tai-Mare?
22  A    Initially I didn't say that I didn't have any
23  contact with him when he was calling me.  But, we did
24  talk a couple times, and he said he was coming to see
25  me, but he never made it.

1  Q      Did he come to your door at one point?

2  A      I don't know.

3  Q      Did you tell the detectives he was banging on

4  your door?

5  A      I don't know for sure if he was or not.

6  Q      Someone was banging on your door?

7  A      I don't know.

8  Q      Did you tell them that Tai-Mare was banging on

9  your door that night?

10 A      I said I didn't know if he was or not.  I

11 didn't see him at all that day.  He did never made it

12 for as long as I know it.  It was the middle of the

13 night when he was calling me, and we was calling back

14 and forth.  I never wanted to keep waiting to bed.  I never wanted to keep

15 waiting on him.  Taye is always doing stuff like that,

16 as far as like, "I'm going to come," and don't come,

17 or "I'm going to come see you," and don't come, or

18 "I'll come bring you money," and don't come.  Like,

19 that's how he is, always dubbing me on something.

20 Q      But then somebody banged on the door?

21 A      I don't know.

22 Q      You didn't just tell them that?

23 A      I told them I don't know if he was banging on

24 the door or not.

25 Q      But somebody was?

                                              40

1  A      I don't know.

2  Q      Did you look out the window?

3  A      No.  I never got up out of the bed.  I didn't.

4          MR. BURD:  All right.  Thank you very much.

5  I don't have any further questions.

6          And right now, let the record reflect, ladies

7  and gentlemen, that it is 11:46 a.m., on April 29th,

8  2016.  This session of the Lehigh County Investigating

9  Grand Jury is hereby concluded.

10         Thank you ladies and gentlemen.  Have a nice

11 weekend.

12         (Whereupon, the witness was excused and the

13 Investigating Grand Jury concluded for the day.)

14

15

16

17

18

19

20

21

22

23

24

25

Date: _May. 4, 2016_ .

       I hereby certify that the proceedings and
evidence are contained fully and accurately in the
notes taken by me of the Grand Jury proceeding of
the above-cause and that this is a correct
transcript of the same.

_Lenore J. Wagner_

Lenore J. Wagner, RPR
Official Court Reporter

*Eric Davis's*
*Copy's*

14117108
Homicide

940 W Pine St Apartment 1

V: Jose Vincente Carrero DOB 07/31/1990

V: Jose Damien Morales DOB 08/04/1986


On December 9, 2014 at approximately 0400 hours, I received a phone call from Det/Sgt Sannie in reference to a home invasion robbery/homicide that had just occurred at 940 W Pine St Apartment 1. I then spoke to Det Beky who was also contacted in reference to this incident. I learned that one of the victims of this incident (later identified as Jose Morales) had been transported to Lehigh Valley Hospital Cedar Crest (LVHCC) for treatment of his injuries. Det Beky advised me that he would respond to the hospital to speak to Morales.

Upon arrival to the location, I met with numerous patrol units and Capt. Lake. The scene had already been secured. I entered 940 Pine Street and immediately noticed a large amount of blood in the common hallway. Being careful to avoid disturbing this scene, I entered Apartment 1. I spoke with Deputy Coroner Craig Hanzl and Deputy Coroner Andy Kehm. They pointed out an additional male victim inside of the residence. This male, later identified as Jose Carrero, was in the front bedroom and clearly deceased from what appeared to be at least one gunshot wound to the left side of his chest. Hanzl advised me that he had already pronounced this male deceased and documented this time as 0442.

I was in contact with Det Beky at LVHCC. Det Beky was able to speak to Jose Morales. Morales reported that he was spending the night at the apartment to watch the victim's 5 year old daughter in the morning while Jose Carrero took a female to work around 0400 hours. Morales stated that he did not live in the apartment with Carrero. Morales' initial report was that two black males entered the apartment, possibly through a rear door. He stated that one of the males shot at Carrero three to four times. The same male that shot at Carrero then shot Morales in his leg. Morales reported that the two males were demanding money. They stole approximately $200 from Morales before fleeing the apartment through the rear door. Morales also reported that he could not find his cell phone after the incident and believes that one of the actors stole his phone. This phone would be identified as a Metro PCS cellular phone with phone number (484) 353-4314. I made contact with Det Mriss, who was responded to Criminal Investigations and provided him with this information.

ID Sgt G Phillips was also on scene and advised that he was going to mark the smaller pieces of evidence in plain view so that they would not be disturbed. Once this was conducted, all investigators left the apartment. The crime scene access was controlled by Ofc Seltzer. Lehigh County District Attorney James Martin arrived on scene and this incident was discussed. District Attorney Martin advised that he would go to Criminal Investigations and assist Det. Mriss with the search warrant application. Det. Mriss did contact me and stated that he spoke to Metro PCS and learned that Morales' phone was not on and that the last number contacted was 611 at 0246 hours on the same date.

Det. Beky was able to gather more information about the female that Carrero was supposed to pick up for work and she was identified as Glorabell Baldomero DOB 4/2/1991 who resides at 141 N 8th St. Det. Landis had arrived on scene and agreed to go to this location in an attempt to speak to Baldomero. Det. Beky also advised me that Morales was in possession of Carrero's cellular phone at the hospital and had used Carrero's phone to call 911.



I was made aware that a neighbor may have information related to this incident and I was directed to 937 W Pine St Apartment 2. I met with Carlos Batista DOB 6/27/1968 Phone (610)393-9241. Batista told me that earlier in the morning (he believes it was in the 2 am hour but closer to 3) he heard a group of people arguing in front of 940 Pine St. He stated that he did not look outside but believes that it was four people with one being a female. He stated that all parties were speaking English. He said that the argument was loud and was certain that the group was outside. He said that the argument got quiet and believes that the group may have went inside. He said that there was about a 10 minute delay and he heard what he believed to be two gunshots. The argument then got louder as if the group had come back outside. I asked him if there were any vehicles on the block that were tied into 940 Pine

St, specifically Apartment 1. He pointed out a maroon Toyota Scion parked at the southeast corner of Palm St and Pine St and stated that he has seen a young female leave the apartment and get into that vehicle as recently as yesterday.

I went to this vehicle and requested Comm Center to run the plate, identified as PA JRP-8759. This vehicle returned to Glorivi Lima with an address of 816 N 8th St Reading PA. I looked into the vehicle through the windows and nothing out of the ordinary was observed in plain view. I was then asked to respond to LVHCC to meet with Det Beky and to also retrieve video surveillance obtained by Ofc D'Argenio.

I learned that Morales' hands had been bagged to preserve any possible evidence. I made contact with ID Officer Motz who collected the required materials to collect any possible evidence from Morales. We both responded to LVHCC and met with Det Beky and Ofc D'Argenio. Morales signed a consent form to collect a buccal swab, fingernail scrapings, photographs, and gunshot residue. Ofc Motz collected evidence from Morales. I took custody of the VHS cassette from Ofc D'Argenio along with Carrero's cellular phone, identified as a Samsung Galaxy S4. Both of these items were taken into my custody at 0905 hours. I briefly spoke to Morales with Det Beky present. I received the following suspect description:

Suspect 1-Black male wearing all black. Approximately 5'9" Stocky build. Believed to be wearing a mask. This is the same male that shot Carrero and Morales.

Suspect 2-Black male wearing a blue hoodie with beige writing on it. Approximately 5'9" with a thin build. This male was not wearing a mask to cover his face and he is described as being "baby faced".

I spoke to Morales about the events leading up to the shooting, specifically about any arguments that might have happened in front of the house. Morales told me that he had left the house around midnight and went to the 7-11 (11 E Susquehanna St) to meet with his friend Manny. He said that Manny is also the night clerk at the store. He stated that he was at the 7-11 until roughly 3 in the morning until he left to go back to Pine St. I asked him why he spent that much time at a convenience store and he told me that he pays Manny cash and Manny uses his bank card to pay his phone bill. Morales said that his phone was acting up all day and needed Manny's help to correct the issue and contact Metro PCS. He said that the majority of the time at the store was spent working on getting his phone in order. He told me that he had driven the Toyota Scion to the store and returned back to Pine St around 3. Morales did state that he called Metro PCS while driving back to Pine St since his phone was still acting up. Morales said that he had no idea about any argument but said that Carrero was asleep when he got back so he doubts that if there was any argument, it had anything to do with Carrero.

Morales stated that after the shooting, he went to the back door and locked it. He then went to find his phone but couldn't find it. He observed K2 on the floor of the living room and placed this into a backpack. He put the backpack into the closet in the bedroom. He then searched Carrero's room for his cell phone and called 911 from Carrero's phone. Morales also signed a consent for release of his medical records.

I then returned to CID and spoke to Det Landis who had been speaking to Glorabell Baldomero. Numerous friends and family members of the victim had now arrived at police headquarters. Numerous investigators assisted in speaking to these individuals. I spoke to Christine Rivera, the mother of one of the victim's children.

**This interview was recorded with Rivera's consent in the CID Conference Room on 12/9/14 at 1004 hours.** I asked Rivera about the last contact she had with Carrero. She said that she had spoken to him on the phone around 2030 hours on 12/8/14 in reference to her picking up her son from 940 Pine St Apt 1. She stated that she arrive around 2100 hours on the same date. Carrero had apparently left with another male, Girard, to look at a vehicle. Her son was being watched by Isaiah Vargas and Jose Morales. She did tell me that she was made aware that Girard was apparently pulled over by the police somewhere in the area of N 10th St/Pine St. Rivera picked up her son and left.

She stated that she last had contact with Carrero around midnight of the same night when she sent him a text message telling him goodnight. He returned her text around 0015 hours on 12/9/14 saying goodnight to her. I asked her if she was aware of anyone that had problems with Carrero. She said that the only one she could think of was Jason Cruz. She stated that Cruz is also involved in dealing K2 and has had problems with Carrero in the past, to include this past summer. She also told me that when she was living at 7th/Greenleaf, she was the victim of a home

invasion robbery that she believed was done by Crip gang members and the "word on the street" was that Cruz ordered the home invasion. She also stated that she had lived in Cruz's old residence at 633 S Carldon after he moved out and that Cruz would be known to drive by the house with cars full of people trying to intimidate her and Carrero. I concluded the interview with Rivera. Det Landis then spoke to Girard Asencio (See his report for further).

I then spoke to Jessica Maes from Hamilton Services Group 824 Walnut St Allentown PA (610) 770-6014. I learned that Jose Carrero and Eduardo Rivera had moved into 940 Pine St Apt 1 on October 31, 2014 and the two were on the lease together. Rivera was interviewed by other investigators.

I was told that Glorivi Lima had come to CID to speak to me. I briefly spoke to her and learned that she was Carrero's mother and the owner of the Toyota Scion bearing PA JRP-8759 at the intersection of N Palm St/Pine St. She was escorted into CID interview room 2. She expressed some concern with a language barrier and Det Almonte assisted. **She agreed to have the interview recorded in CID Interview Room 2 which was conducted on 12/9/2014 at 1345 hours.** Lima told me that she last had contact with her son on Sunday at one of the garages that he used to work on vehicles. She did provide me with written consent to search the Toyota Scion. The interview was concluded.

Myself and Det Landis then went to LVHCC for a second interview with Jose Morales. He was being treated in the Transitional Trauma Unit. We again went over the events surrounding the shooting and the events leading up to it. He again stated that he returned to the Pine St residence and fell asleep on the mattress that Carrero left for him in the living room. He stated that he was sleeping in his clothing to include gray sweatpants, a black hoodie and a beanie. He also had his shoes on. He said that he woke up to getting hit by an unknown person. He struggled with this person and "immediately" heard gunshots. He stated that he wanted to see what was going on but his beanie was covering his eyes. Morales said that he believes he heard at least two shots from the living room.

He was asked what he did when he got home from the 7-11. He stated that he went into the building using the key that was on the key ring. He went into the apartment and saw that the bedroom door was closed and assumed that Carrero was sleeping. He went to the back door to make sure it was locked and turned off the kitchen light that was left on. He played with his phone for a few minutes and found that it still wasn't working right. He took the battery out of his phone, put it back in and fell asleep. He was asked why he would check the back door to see if it was locked and he said that he normally checks the doors to see if they are locked before he goes to sleep. I found this strange and he said that it is just a habit.

Morales again gave the same description of the actors and also said that the thin black male suspect "talked differently". I asked him to explain and he said he couldn't quite figure it out but said that he just talked differently. I advised Morales that there was some discussion about this incident being a possible set up. Morales adamantly denied this and immediately offered to take a "lie detector test". Morales was left with our contact information and asked to contact us when he is told he is being discharged.

Det Brixius was able to view the VHS tape retrieved from 952 Pine St. This footage is not time stamped but shows a van (unknown make/model) on Hazel St at Pine St prior to the sirens being heard in the background.

On December 10, 2014 myself and Det Landis made contact with LVHCC and were advised that Morales was ready to be discharged. We went to the hospital and picked up Morales. He agreed to come to CID and speak to us about this incident. **Morales was placed into CID Interview Room 1 on December 10, 2014 at 1300 hours.** He consented to have our conversation recorded. The full content of the interview is available via recording but I will summarize.

Morales was asked about his day leading up to the shooting. He stated that he was at his house on S Carldon St and was picked up around 1430 hours on December 8, 2014 by Carrero in the Scion. The two drove to Central Elementary to pick up Carrero's daughter. They then went to A1 towing and met with Gerard Ascensio to get his white Ford Ranger out of impound. Morales then drives the truck to Gerard's mother's house in the area of 15/Liberty to drop it off. Carrero, Morales, Ascensio and the two kids get back into the Scion and drive to the 400 block of N Hall St to look at a vehicle that Ascensio wanted to purchase. Ascencio and Carrero test drive the vehicle. Ascensio stays in the 400 block of N Hall St and Carrero takes Morales and the children back to Pine St. Morales stays with the kids.

Morales then hangs out at the home until Carrero returns. Learns that Ascencio was pulled over in the area. Rolando Tubens and Luis are at the house during this time. Rolando leaves to his sister's house. Carrero wants to find out what happened to Ascencio and the group leaves the house. Morales stays with the kids. Carrero, Isaiah Vargas get back to the house. Ascencio and Luis arrive a short time later. While the entire group was present, they talked about the Honda Civic that Ascencio wanted to purchase. Morales states that the gate out back is open while they are talking.

Morales states that around 2300 hours on December 8, 2014 he, Carrero, Ascencio, and Luis go out front of 940 Pine St and talk for about 40 minutes. Vargas is inside watching the kids and comes out to ask if Carrero has plans to go out. Carrero does not and Vargas says that he is leaving. The group talks for a while and Ascencio and Luis leave. Morales and Carrero go back inside.

Morales states that around midnight he left Pine St in Carrero's Scion. Carrero is watching Facebook videos when he leaves and the daughter is asleep in the bed. Morales goes to the 7-11 (11 E Susquehanna) and meets with his friend, known to him as "Indio" or "Manny". Morales is having issues with his cell phone and states that he pays Manny cash and Manny uses his card to pay for the cell phone. Morales reports being at the store for close to 3 hours and leaves to return to Pine St.

Upon returning to Pine St, Morales unlocks the security door and apartment door. He goes inside and sees that Carrero's bedroom door is closed. He doesn't hear snoring but believes Carrero is asleep since it is close to 3AM.

Morales walks into the kitchen and checked to make sure the back door is locked. He turns off the lights and goes to the living room. He situates a mattress that he uses on the floor and puts two pillows on the mattress. He was on Facebook but his phone is acting up. He takes the phone apart and puts it back together but the phone still won't work. He puts the phone down and falls asleep. Morales states that he is fully dressed when he falls asleep to include his shoes.

Shortly after falling asleep, Morales hears a slam and then a "boom". He feels someone's knees in his back and his hood being pulled over his face. He feels something hit his head but manages to get up. He hears one gunshot as he stands up and is now by the tall speaker in the living room. There is one male next to him and another near the television pointing a handgun in the direction of Carrero's bedroom.

He describes the males. Male 1: B/M early 20's, no facial hair. Navy blue sweater with beige letters on the front. Dark gray pants, thin build, approximately 5'8". Had his hood up and no gun. Male 2: B/M dressed all in black, armed with gun, and had some sort of mask over his face. Describes the gun as "long black semiautomatic". Stocky build, 5'9" tall. Morales is certain that these males are black.

The male armed with the gun is now pointing it back and forth between Morales and Carrero's bedroom. The other male runs from the bedroom to the kitchen and back. Seems to be upset. Suspect with the gun demands the money. Morales points to his money and the armed male shoots him in the leg. They take the money and run towards the rear of the apartment. After the suspects leave, Morales checks on Carrero and finds him still breathing. He goes to the living room to find his cell phone but can't find it. He goes to the back door and locks it. He returns to the living room and sees K2 on the ground. He picks this up and puts it in a bag. He walks into Carrero's room, throws the bag in the closet, and finds Carrero's phone. He calls 911.

END OF INTERVIEW. Morales calls for a ride and is picked up by Raul Roman.

On December 10, 2014 at 1446 hours I made phone contact with the 7-11 in an attempt to obtain video surveillance related to Morales' interview. I was told that I could come to the store at any time and watch the video.

Later that same day, myself and Det Beky went to the 900 block of Pine St and met with a large group of family and friends. Information was requested from anyone willing to assist. An attempt was also made to speak to Carlos Bautista again. A female at the building stated that there was nobody there by that name and it was believed that she was afraid to speak to us in front of the large crowd.

On December 10, 2014 at 2120 hours, I received a phone call from Gerard Ascencio. He advised me that he might have an item that I would be interested in and asks me to meet him behind Christine Rivera's home at 834 Chestnut

St. Myself, Det Ferraro, and Det Beky go to this location and meet with Ascencio, Eddie Rivera, and Christine Rivera. He explained to me that earlier in the day, there was a large vigil held in the 900 block of Pine St (the one that myself and Det Beky went to). He said that Jose Medina was present during the vigil but was "acting weird". Ascencio stated that Medina is friends with Alexander Padilla who also sells K2. He states that the two have not really been around or heard from since the shooting and found this strange. Ascencio states that Medina dropped his phone while he was on Pine St and he picked it up. This phone was turned over to me and identified as a black Pantech cellular phone model P9090. The phone was still on and I removed the battery immediately.

I returned to police headquarters and checked to see if there were any reports related to the theft or loss of a cellular phone filed by Medina. None were located. I attempted phone contact with Medina with no success.

The phone was held as evidence until contact could be made with FDDA Luksa. FDDA Luksa would approve a search warrant for this phone which was executed but no evidence related to the homicide was located in the phone.

Evidence located at 940 W Pine St would be submitted for DNA testing to include a black knit hat with the letter "P" on it. Morales was asked if this hat was his and he stated that it was not. Friends and family of Jose Carrero were asked if this hat belonged to him and all parties asked stated that he never wore a hat like this. This hat was located and recovered on the floor of the kitchen.

Throughout the following months, numerous tips were received from the friends and family of the victim. All leads were followed up on and found to produce no pertinent information.

Jose Morales would also be contacted and he did take a polygraph examination administered by Detective Bill Williams (See Report for further). Morales continued to deny any knowledge of the incident and continued to state that he had no idea who would have entered the apartment and shot him and Carrero.

In April 2015, results were received from the DNA analysis on the black knit hat which is included in this report.

| | |
|---|---|
| PENNSYLVANIA STATE POLICE | **LAB REPORT:** B14-04634-2 |
| BUREAU OF FORENSIC SERVICES | **REPORT DATE:** April 17, 2015 |
| **Forensic DNA Division** | **INCIDENT NO.:** 14-117108 |

Data in this table are results that satisfy this laboratory's interpretation guidelines. Genetic loci Amelogenin and DYS391 are not used in any statistical calculations.

() indicates minor/less intense alleles
-- indicates no results at the genetic locus

3   The DNA profile obtained from the cutting from the black knit hat (Item Q1) is consistent with a mixture of at least three (3) individuals. The major component of this DNA profile is consistent with a mixture of at least two (2) individuals. The major component of this unidentified DNA mixture profile was searched against State DNA Database at the above mentioned loci.

As a result of a CODIS search, these individuals cannot be eliminated as possible investigative leads to the unidentified DNA mixture profile obtained from the cutting from the black knit hat (Item Q1).

Name:  Eric M. Davis
SSN:   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
DOB:   06/08/1981
Sex:   Male
State: Pennsylvania
SID #: 241-86-92-0
FBI #: 648872AC1

Name:  Candice M. Agudio
SSN:   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
DOB:   08/09/1986
Sex:   Female
State: Pennsylvania
SID #: 290-42-26-8
FBI #: 174429MC5

This report is considered a preliminary report and may be used as probable cause to obtain a search warrant for an appropriate reference sample(s) from the individual(s). In order to issue a final report for the comparison of the profile of the individual(s) to the questioned sample(s), a blood sample in a lavender top tube or a buccal collector from the above listed individual(s) shall be submitted to the laboratory.

NO OFFICIAL SCIENTIFIC COMPARISON CAN BE MADE WITHOUT THE SUBMISSION OF THIS REFERENCE SAMPLE. AN OFFICIAL CONFIRMATORY REPORT WILL BE ISSUED ONCE THE REDRAWN SAMPLE IS ANALYZED.

The major component has been uploaded and will continue to be searched on a weekly basis as additional profiles are entered into the State DNA Database. No distinctive genetic profile was obtained from this sample for upload into the National DNA Database.

Additional minor/less intense alleles were also present in genetic loci D3S1358, D18S51, D2S1338, D7S820, and D8S1179. No further interpretation could be made due to an insufficient quantity of DNA from this minor component.

Page 3 of 6
Any results, conclusions, interpretations, and/or opinions in this laboratory report are those of the author.

Interview with Candice Aguido

4/28/2015 1411 hours

1046 Pike St Reading PA

Myself and Det Landis made contact with Candice Aguido at her residence (1046 Pike St 2nd floor rear) on April 28, 2015 at approximately 1411 hours. We identified ourselves as Detectives and she agreed to speak to us. Her boyfriend, Eric Davis, was present at the apartment. Davis asked what was going on and Det Landis told him that we were Detectives and only wanted to speak to Candice.

Candice agreed to speak to us in the unmarked Ford Fusion. Det Landis sat in the front passenger seat while I sat in the rear passenger seat with Candice in the rear driver's seat.

Candice was asked about the last time she was in Allentown. She said that she hasn't been to Allentown outside of a trip to Dorney Park. I showed her the photo of the black knit hat recovered at 940 Pine St. I asked her if she recognized this hat and she told me that she had never seen it before. I then asked her why her DNA was present in the hat. She now stated that she did recognize the hat and that a lot of her friends have similar hats. She said that she is from the Philadelphia area and that would explain the P on the front of the hat. I again asked her why her DNA would be found on the hat and she said that she "probably" put on the hat at some point because she was cold. I asked her when and how she would have come across the hat and she said that one of her friends must have left it in her vehicle. She could not recall which friend would have left it in the vehicle.

At this time in the interview, Eric Davis, was seen getting into Aguido's vehicle and leaving the area. Aguido tried to get his attention and he stopped briefly. She rolled down her window but Davis motioned something and drove away. I found this odd since his girlfriend was speaking to detectives and he would not have known what was being discussed or what would happen to Aguido.

The interview continued and she was asked numerous times about the knit hat. She said that she last saw the hat a couple of months ago. She did admit that Eric has the same hat. She initially told me that she had asked Eric where the hat was but changed her statement immediately to that she asked her friends where the hat was. I asked her why she would ask her friends about the location of a hat and she said that she likes Eric to keep his head warm. This part of the interview was very confusing and Aguido would not clarify her statements.

Aguido was asked about any known associates of Eric Davis. She said that she didn't know their "governments" but gave me the name "Sleep". I recognized this name immediately related to a home invasion robbery in July 2014. "Sleep" was identified as Jamal Simmons after he was arrested for his role in the drug related home invasion at 426 Chestnut St. I described Simmons to Aguido and she said that the description was right.

Aguido was then given the opportunity to be truthful and told that this was in relation to a homicide investigation. She then said that she knew about the homicide from Facebook and Fox 29 news. I found this strange since neither myself nor Det Landis ever told her the facts surrounding the homicide, the victim's name, location, or date of the homicide.

Aguido did provide me with phone numbers for herself and Eric Davis.

Aguido then said that she wanted to talk to her brother who works in some capacity with the federal government before she speaks to us any further. She was given business cards and went back into her home.

While enroute back to Allentown, I received a phone call from CID. I was told that Eric Davis had just called and would like a call back. I called Mr. Davis back on his cell phone. He immediately wanted to know why I thought it was odd that he would leave while his girlfriend is speaking to the police. I felt that this didn't need an explanation but tried anyway. He still did not seem to think this was odd. I then told him that I was pretty certain he was aware of what was discussed with Aguido. I asked him why his hat was found at a homicide scene with his DNA in it. He did not dispute that the hat was his and also said that he gave the hat to a friend but couldn't remember the friend's name. He then asked if he needed an attorney. I told him that it was not my job to tell him what he needs. He then said that he wanted to consult with his mother and get an attorney for himself and Aguido. He hung up.


**14-117108**

**Homicide Investigation**

**Interview w/ Candace Agudio**

**7/17/2015 1000 hours**

**Berks County Prison**

On July 17, 2015 at approximately 1000 hours, myself and Detective Beky drove to the Berks County Prison to speak to Candace Agudio in reference to this investigation. Arrangements were made with prison staff to arrange a private room for the purposes of this interview.

Upon arrival, myself and Det Beky were escorted to the interview room. Agudio was requested to come to the room by prison staff. When Agudio arrived, I first asked her if she remembered me and she said that she did. I told her that I wanted to ask a few follow up questions regarding our prior conversation in the car. She agreed to speak to me. I then asked her about her relationship with Eric Davis. She said that they are no longer together. I advised her that since she is in prison and I would be asking her questions, I would like to read her the Miranda Warnings. I read these warnings from the form and she agreed to speak to us. She signed this document in my presence.

I began the interview by telling her that I am fairly certain she was not present in Allentown at the time of the homicide. I told her that I really wanted to talk to her as a witness and that I believe she had information pertaining to this investigation.

I first asked her about the cell phone numbers that she may have had during the time of the homicide. I had already submitted court orders and received information back from the providers related to the numbers she had provided me in the first interview. She confirmed that her phone number at the time of the homicide was 610-507-2759. The historical information provided from T-Mobile already showed that this phone was in Reading in the immediate time frame of the homicide.

I stopped this line of questioning and asked her if Eric Davis had told her anything about this incident. She stated that following the interview with her in the car, she had confronted Davis about the conversation. She said that Davis told her that he was involved in the homicide. More specifically, she stated that Davis told her that he was driven to Allentown by a male who is not known to her. She said that a male known to her as Animal was also present. Davis told her that Animal crawled in through a bathroom window and let Davis into the home. Davis said that he was holding two people at gunpoint when one of the people in the home started to fight with him. She said that Animal shot this male (Jose Morales) and then shot the other male in the home (Jose Carrero).

With this information, I then asked if she had contacted any of the parties involved at the time of the murder. She said that Eric Davis did not have a cell phone but that he would give her the phone numbers of the people that he was with and she would call them. I showed her the phone records from the night of the murder. There were calls made to (484) 219-3878 on the night of December 8, 2014 and two calls to this number on December 9, 2014 at 0426 hours and 0428 hours. She said that she wasn't sure whose number this was but believed it may have been the driver. She said that Animal has a weird number from New Jersey. I found some calls around the same time to and from phone number (973) 981-6846. She did identify this number as being Animal's phone number.

Agudio described Animal as a black male around 5'7" tall with a thin build. She said that he had short dreads. I had already received reports from Reading Police regarding any contact with Eric Davis and found that a male named Sean Kinchen DOB 2/13/1988 had been stopped driving a vehicle registered to Davis one month prior to the homicide. I had viewed his photo and he fit the description provided by Agudio. I would later review this report again and see that he provided the phone number (973) 981-6846 to the Reading Police Officers.

I contacted FADA Luksa regarding the conversation with Agudio. He stated that he would make arrangements to have Agudio transported to Lehigh County for a more formal interview at Allentown Police. This was relayed to Agudio and she did not object.

**14-117108**

**Homicide Investigation**

**Interview w/ Candace Agudio**

**7/23/2015 0909 Hours**

**CID Interview Room 2**

On July 23, 2015 at approximately 0909 Hours, a third interview was conducted with Candace Agudio. She was transported from Berks County Prison to Allentown by Ofc Rushatz and Ofc Miller on a writ facilitated by FDDA Luksa.

This interview commenced at 0909 Hours and was recorded with Agudio's consent. Det Landis and Det Beky also assisted in the interview process.

During this interview, Agudio stated that she wrote down additional information regarding this incident but was not aware that she was coming to Allentown to speak to us and did not bring this paperwork. She said that she remembered what she wrote and provided us with the following information.

-Within days following December 9, 2014 Eric Davis and "Animal" were cleaning a blue SUV while wearing gloves and using bleach. Agudio said that Davis told her not to touch anything in the truck.

-Agudio said that this blue SUV belongs to a male known to her as "Joe" from the Reading area. She said that "Joe" was almost killed after he ran into a hotel room and was stabbed multiple times. She described him as an older white male who is a drug addict. She said that "Joe" is like a father to her and that he always looks out for her.

-She also stated that a male known to her as "Taymar" was present during the murder. She said that she heard a direct conversation between Eric Davis and "Animal" where the two were mad at "Taymar" because he did not go into the house and stayed in the vehicle with a female. She said that "Taymar" had recently been arrested for shooting someone numerous times under the Spring St Bridge in Reading but that he beat the case.

I showed Agudio a stand alone photo of Eric Davis and she positively identified him on July 23, 2015 at 0913 hours. I went over her relationship with "Animal". She again stated that "Animal" had lived with her for a period of time and that she last saw "Animal" in February. She said that she would frequently see "Animal" and she was then shown a stand alone photo of Sean Kinchen. She positively identified "Animal" as Sean Kinchen on July 23, 2015 at 0913 hours.

I then showed her a photo of Chris Clemens. I spoke to her about the phone records involving phone number 484 219 3878 which she believed would be the driver during the murder. This phone number had already been linked to Chris Clemens and she immediately identified Clemens but said that he wasn't the driver. She said that Clemens would trade his phone for drugs and this was most likely the case. She again said that "Taymar" was driving. She was asked how well she knew "Taymar" and she said that she would see him all the time with Eric and "Animal".

With the information that she had provided earlier, I contacted Reading Police and spoke to Detective Joseph Snell. I asked him about "Taymar" and gave him the information provided by Agudio. Snell immediately knew who I was talking about and provided me with the name of Taimare Mercado DOB 06/08/1989. I then asked him if he or any other investigator knew "Joe" and told him what Agudio had told us about his past. He was able to make contact with Detective Jenkins who had investigated the stabbing case. He identified this male as Jody Silvia DOB 05/21/1970 and said that Sylvia does own a blue SUV. A file 2 request was run through Comm Center and it was

discovered that Sylvia does own a 2004 Jeep Grand Cherokee Laredo bearing PA Registration JWG 0305. I printed out a generic photo of this vehicle along with stand alone photos of Sylvia and Mercado.

Agudio did identify Sylvia as "Joe" and Mercado as "Taymar" through the stand alone photos on July 23, 2015 at 1008 Hours.

I had already looked into phone numbers returned by Sprint and T-Mobile for the phone numbers 973-981-6846 and 484-219-3878 and found that a common phone number (215-767-3325) returned to Jody Sylvia.

The full content of the interview is available via the recording.

I made phone contact with Sylvia. I asked him about his vehicle, namely the blue Jeep Cherokee. I learned that this vehicle had been repossessed and I asked him about any times that the vehicle was returned to him in a strange condition. He did tell me that Eric Davis had borrowed his car and that it was returned smelling of bleach and that the instrument panels were covered in a film from cleaning them. A meeting with Sylvia will be scheduled.


## Christopher Clemens


-Phone number (484 219 3878) on Candice Agudio/Eric Davis' phone records during time of murder

-Agudio states she called numbers during the homicide to locate Eric. Called this number to look for him.

-Phone Order submitted to Sprint. Results returned to subscriber Christopher Clemens. Calls plotted during time of homicide show this phone in Reading prior to the homicide, in Allentown during the time of the homicide, and back to Reading following the homicide

-Clemens found to be on State Parole. Contact with Larry Snyder (PA State Parole). Last contact with Clemens in January 2015. Was supposed to live with girlfriend Jennifer Mummau in Elizabethtown area but she backed out

-PACIC does work up. Labor and Industry show he works for Labor Ready. Numerous family members in Lancaster area.

-Contact with Det Sgt Nichols Lancaster PD (717 989 3391 Cell). Information relayed to Nichols to include vehicle information from TLO. Vehicle registered to Clemens (PA JTP4785) on LPR in Manheim July 7, 2015.

-Labor Ready contacted. Last employed on May 27, 2015. Provided address of 1733 Lincoln Hwy E Lancaster and phone number 717 538 4845. Gave emergency contact of his father Ralph Clemens 717 368 4152. Information relayed to Nichols


## Nikita Cespedes

On July 23, 2015, I began looking into phone numbers located on Call Detail Records from the phone numbers 973-981-6846 (Believed to be Sean Kinchen's phone number) and 484-219-3878 (Believed to be Taimare Mercado's phone number). I began checking the phone numbers located on these records around the time of the homicide and compared them to phone numbers located in Jose Carrero's cell phone. I found that one phone number was located in Kinchen's phone and Carrero's phone. This phone number was identified as 484-387-3073. In messages on Carrero's phone, this number texts him and the person identifies as "Nore". There is contact from this number to Carrero's phone up to December 7, 2014.

I checked ICIS and RIIC records and found that this number was associated with Nikita Cespedes. I located a Facebook page of "Nore Cespedes" which led me to check the messages between Carrero and "Nore" on Facebook (via the search warrant results) and Carrero's phone. I found mentions of someone named Fuffie and found an

additional Facebook page on Carrero's results for "Fuffie Conyer". I checked public photos of "Fuffie Conyer" and immediately recognized her as Afua Conyer. I located a phone number for Afua and asked her to attempt to make contact with Nikita Cespedes and have her call me. Afua asked what this was in reference to and I told her that it was a homicide investigation and she asked me which one. I told her that it was for "Tito" and she immediately said "I fucking knew it". She told me that she would get a phone number for Nikita.

Within a few minutes, I received a phone call from Afua and she provided me with the phone number 302-565-7706. I called this number a left a message. A short time later, I received a phone call from Nikita Cespedes. I told her that I would like to speak to her regarding a homicide investigation and she also asked which homicide I was referring to. I told her that it involved "Tito" and she asked why I wanted to talk to her about it. I told her that her phone number showed up in the homicide suspect's phone and in Tito's phone. I told her that the name "Nore" came up in the messages and she said that her name is Nikita and not "Nore". I asked her not to play games and she said that she does go by "Nore" but that it was pronounced differently. She immediately became defensive and told me that she has the right to call whoever she wants and that she didn't need to talk to me. There was a heated discussion between us and I again told her that her phone number is the only one that appears in both phones. I mentioned the name Taimare and she said that she knew him and referred to him as her brother. She eventually agreed to meet with me in Reading at Baer Park on July 24, 2015 at 1000.

A short time later, I got another call from Cespedes. She again yelled at me and told me that she didn't need to speak to me. She said that she talked to her mother and that her mother told her that she didn't need to talk to me either. I told her that she has every right not to talk to me but it would be in her best interest to explain why her number is in both phones, especially since it appears in Kinchen's phone numerous times between midnight and 4 am on the day of the homicide. She told me that she would call me back in 20 minutes. I never received another phone call from Cespedes.

On July 24, 2015 I received a phone call at home from Detective Landis. He stated that Cespedes had called in to CID and again agreed to meet. Detective Landis stated that Cespedes was again very defensive but agreed upon meeting at Glenside Elementary School in Reading PA at 1000 Hours.

Myself and Detective Landis did speak with Nikita on the steps of the school on July 24, 2015 at 1005 Hours. During this meeting, Cespedes stated that she did have the phone number 484-387-3073 around early December. She said that she had moved to Reading from Allentown (namely 212 N 14th St) in early December and confirmed that it was shortly after Carrero was murdered. Cespedes was asked what she was doing on the night of December 8, 2014 into the early morning hours of December 9, 2014. She immediately said that she was at home with her kids. She said she was in bed listening to Pandora and smoking a blunt. I found it strange that she could remember exactly what she was doing on a random night 8 months ago. She then said that this is her nightly routine.

I asked her about the phone contact with Taimare Mercado and Sean Kinchen that day. She said that Mercado (who she referred to as Tay) is like her brother and that they normally talk to each other. I told her that her number was not in Mercado's phone and it was in Kinchen's phone. I referred to Kinchen as "Animal" during this conversation since this is his street name. She was shown a single image of Mercado and identified him. She was then shown a single image of Kinchen and she said that she did not know him.

I again asked why her phone number would be in Kinchen's phone and she said that she was trying to reach Mercado. She said that she was calling this number since Mercado was in Allentown and they had talked about meeting up but he was not telling her where he was.

I asked about her relationship with Carrero. She said that she would frequently buy K2 from him. She was asked about his house on Pine St and she said that she had never been to his house. I asked if she knew where he lived and she said that she did but that she had never been inside of his house. She said that Carrero would deliver K2 to her house.

I told her that I believed she either directly set up this murder or gave information to the suspects regarding Carrero. She again became defensive and told me that she didn't want to talk anymore. I stood up to leave and she asked where I was going. I told her that I didn't need her cooperation and that if it was later proven that she had any role in this murder, she would be charged accordingly. She then asked if she could still call me and I told her that if she changed her mind about cooperating, she could reach out to me. Myself and Detective Landis then left.

An interview was conducted with Jody Sylvia at his home. This interview was recorded with his consent. During this interview, Sylvia reports that he loaned his blue Jeep Cherokee to Eric Davis in early December. He stated that he was waiting for Eric Davis to bring the car back but he didn't return until late morning. He said that he noticed that the vehicle was overly clean and even stated that there was a fog on the dashboard as if it had been bleached. Sylvia asked Davis why the car was in this condition and Davis told him that he had sex in the car and wanted to clean it out. He couldn't pin point the exact date but stated that he returned his car to the Auto Star in Reading on that same day due to a faulty GPS unit.

Myself and Detective Landis were able to make contact with the owners at the Auto Star. The owner remembered Sylvia and stated that he believed the car was returned around December 10, 2014. He said that Sylvia stood out because of the issues he has had with other cars in the past. The owner remembered that there was a GPS unit installed in the vehicle in the event that they had to repossess the car. He was able to access the account (Sperion GPS) and found that the vehicle was in Allentown (more specifically the 200 block of N 14th St) on December 9, 2015. He said that the GPS unit only sends out "heartbeats" or locators every 25 hours. Contact was made with Sperion Inc and they were served a court order to supply the records of the GPS unit. These records are attached to this investigation.

1  quick.

2          THE COURT:  Okay.

3          (Whereupon, the sidebar discussion

4  concluded.)

5          THE COURT:  Okay.  Mr. Burd, your next

6  witness.

7          MR. BURD:  Your Honor, the Commonwealth next

8  calls Tai-Mare Mercado.

9          THE COURT:  Okay.  Mr. Mercado, right up to

10  the witness stand, please.  When you get there, please

11  remain standing while the oath is administered.

12          TAI-MARE MERCADO, having been called as a

13  witness, was duly sworn, examined, and testified as

14  follows:

15          THE COURT:  Please be seated.  You'll notice

16  the microphone is adjustable.  Please keep your voice

17  up so the ladies and gentlemen can hear what you have

18  to say.  Mr. Burd.

19          MR. BURD:  Thank you, Your Honor.

20                    DIRECT EXAMINATION

21  BY MR. BURD:

22    Q.  Sir, could you start off please by telling the

23  ladies and gentlemen of the jury your name and then

24  spell your full name for the record, please.

25    A.  Tai-Mare Mercado, T-A-I, hyphen, M-A-R-E.

1    Q.   How old are you today, Mr. Mercado?

2    A.   27.

3    Q.   Do you know the defendant, Eric Davis?

4    A.   Yes.

5    Q.   And how long have you known Eric Davis?

6    A.   About five years.

7    Q.   How would you characterize your relationship

8    with the defendant?

9    A.   We was all right.  I used to deal with him.  I

10   met him years ago.

11   Q.   Were you guys friends?

12   A.   Yes.

13   Q.   You would hang out sometimes?

14   A.   Yes.

15   Q.   Go places together sometimes, sometimes with

16   other people?

17   A.   Yes.

18   Q.   All right.  I want to draw your attention,

19   Mr. Mercado, to a specific day in 2014, December 9th.

20   Do you remember the evening of December 9th, 2014?

21   A.   Yes, I do.

22   Q.   What were you doing that night?

23   A.   I was chilling with a female, and then we made

24   our way over to E's house, Eric's house, and from

25   there, we left with Animal and we went to Allentown.

1     Q.   E -- is that what you knew Mr. Davis?  You knew

2   him as E?

3     A.   Yes.

4     Q.   All right.  And where were you headed?  I'm

5   sorry.

6     A.   To Allentown.

7     Q.   The four of you were going to Allentown

8   together?

9     A.   Yes.

10    Q.   What -- do you remember what vehicle you were

11  in?

12    A.   A black or blue Jeep.

13    Q.   All right.  And who was driving?

14    A.   Eric.

15    Q.   Did you know -- was that Eric's Jeep?

16    A.   I believe it was some guy named Joe's.

17    Q.   Do you know Joe?

18    A.   I know of him in a sense.

19    Q.   Was Joe known to loan his cars to people?

20    A.   Yes, rent his cars.

21    Q.   Did Eric borrow cars from Joe in the past that

22  you know of?

23    A.   I know he had that one from Joe.  I don't know

24  about any prior to that.

25    Q.   Okay.  And what was the plan?  What were you

1    guys going to do in Allentown?

2        A.   Go see Nikita.

3        Q.   Go see Nikita?

4        A.   Yeah.

5        Q.   And who's Nikita?

6        A.   Nikita is somebody I consider like my sister,

7    my family, friend.

8        Q.   Okay.  A close friend of yours?

9        A.   Yes.

10       Q.   All right.  Do you know what address she lived

11   at in Allentown?

12       A.   No.

13       Q.   What time do you guys -- what time do you think

14   you guys left Reading if you can remember?

15       A.   11:00, like 12:00, 1:00 in the morning.

16       Q.   Pretty late?

17       A.   Yeah.  It was kind of spontaneous.

18       Q.   Do you go straight to Allentown?

19       A.   Yes.

20       Q.   Straight to Nikita's house?

21       A.   Yes.

22       Q.   What did you do once you got to Nikita's house?

23       A.   We got to Nikita's house.  We go upstairs.

24   Nikita and her kids was there.  I went in.  They

25   consider me their uncle.  They were sleeping.  I just

1  went in and looked at them.  I was with a female by the

2  name of Bella.  We get there, smoking marijuana,

3  drinking, hanging out.  We was chilling.

4      Q.  Okay.  Now, you had mentioned you had been

5  smoking some marijuana that night?

6      A.  Mm-hmm.

7      Q.  You actually -- you've had some brushes with

8  the law in the past; is that right?

9      A.  Yes.

10      Q.  Do you actually have pending charges for

11  marijuana right now?

12      A.  Yes.

13      Q.  Do you also have a pending charge for a simple

14  assault right now?

15      A.  Yes.

16      Q.  Okay.  So you guys were back at Nikita's

17  hanging out.  At some point, did Animal and Mr. Davis

18  leave?

19      A.  Yes.

20      Q.  How long do you think you were at the residence

21  before they left?

22      A.  10, 20 minutes.

23      Q.  Did they say where they were going?

24      A.  No.  Animal said that he was going to see his

25  homie.

1    Q.   Were you concerned about where they were going?

2    A.   No.  It wasn't -- it wasn't an issue.

3    Q.   What were you concerned with at that moment?

4    A.   The female I was with and just chilling at

5    Nikita's.

6    Q.   What happened after they left?

7    A.   I had sex on the couch with the female.  Nikita

8    went in her room.  She was in her room for about a

9    hour.  We was just chilling around the house.  After

10   that, Nikita came back out and then they came back.

11   Q.   Animal and Mr. Davis came back?

12   A.   Yes.

13   Q.   Describe for the ladies and gentlemen what

14   happened when they got back.

15   A.   They got back.  They said something in the

16   reference of --

17            MS. SMITH:  Objection.  Judge, can we

18   approach briefly?

19            THE COURT:  Yes.

20            (Whereupon, a sidebar discussion was held on

21   the record as follows:)

22            MS. SMITH:  I'm concerned about the phrasing

23   of the question.  I understand that Mr. Davis's

24   statements come in as statement --

25            THE COURT:  Statements during the course of

1    the conspiracy.

2              MS. SMITH:  Exactly.

3              THE COURT:  In furtherance of a conspiracy.

4              MS. SMITH:  I don't believe that Animal's

5    statements, however, should come in.

6              THE COURT:  Why not?

7              MS. SMITH:  Under that same -- I mean --

8              THE COURT:  Isn't that an exception to the

9    hearsay rule?  Statements made during -- in furtherance

10   of a conspiracy.

11             MS. SMITH:  For co-conspirators as well as --

12             THE COURT:  Yeah.

13             MS. SMITH:  -- any noncharged defendants?

14             THE COURT:  Yeah.

15             MS. SMITH:  So --

16             THE COURT:  He is a charged -- he's charged

17   with the conspiracy with Mr. Davis.

18             MS. SMITH:  With Mr. Davis.

19             THE COURT:  Are there outstanding warrants

20   against Mr. Kinchen or not?

21             MR. BURD:  No.

22             THE COURT:  No.  But it is a statement made

23   in furtherance of a conspiracy.

24             MS. SMITH:  Okay.

25             THE COURT:  So all the conspirators'

1    statements come in as long as the conspiracy is still

2    in existence and the conspiracy remains in existence at

3    that point.

4         MS. SMITH:  What I would ask then, Judge, is

5    that --

6         THE COURT:  Including the flight.

7         MS. SMITH:  -- rather they -- what did they

8    say, that we be specific about who is saying what.

9         THE COURT:  If you can.  If you can find --

10        MR. BURD:  I don't think he's going to be

11   able to.  I mean, I can ask him.

12        THE COURT:  You can ask him.  And so all the

13   statements in furtherance of the conspiracy all come in

14   as long as they're part of the conspiracy.

15        MS. SMITH:  And in that case, I would just

16   ask that he try to be as specific as possible.

17        THE COURT:  Okay.  So is there an objection

18   or not?

19        MS. SMITH:  I'll assume my objection.  And

20   Your Honor overruled it rather than withdrawing the

21   objection?

22        THE COURT:  No.  You have to tell me --

23        MS. SMITH:  I will object.

24        THE COURT:  Okay.  The objection is

25   overruled.

1          MS. SMITH:  Okay.

2          (Whereupon, the sidebar discussion

3    concluded.)

4    BY MR. BURD:

5      Q.  Mr. Mercado, you were saying that when he and

6    Animal got back to the house, they were talking about

7    what they had done when they were gone?

8      A.  Yes.

9      Q.  And what did they say?

10     A.  They went to some guy's house.  They pushed in

11   -- somebody -- Animal pushed in a back window.  They

12   went in the house.  Some guy was sleeping on a couch or

13   something like that in the living room.  He woke up

14   like out of sleep, bugging out, and somebody

15   pistol-whipped him.  E pistol -- well, somebody

16   pistol-whipped him, that the guy had a gun.  Somebody

17   shot -- Animal shot through a door and shot the boy.

18          They came back.  They had big bags of plastic

19   bags with holes in them, and it was filled with packs

20   of K2.  Animal had a firearm -- silver.  They got,

21   like, bragging about what they did.  I started snapping

22   because --

23     Q.  What does that mean, you were snapping?

24     A.  I was upset because, you know what I mean, I

25   didn't want to put myself in that predicament.  We went

 1    there for a reason.  I went out there for a reason to

 2    chill with Shortie and be with Nikita -- see Nikita.

 3    It was just spontaneous.  We just went.  E drove me.

 4            It got to the point where I started calling

 5    people to come pick me and the girl I was with up

 6    because I didn't want to drive back with them because I

 7    was upset of what they did.  I called the girl -- I

 8    called a female, Jesse, to come pick me up.  It was

 9    late.  She didn't want to come pick me up.  I told

10    Animal and them and E that I was staying at the house

11    and I'd get a ride in the morning.

12            E and Animal told me, stop bitching.  And they

13    was upset about what the boy had in the house, that

14    there was no money there.  There was packs of K2.

15    Q.   They were mad that they didn't get enough stuff

16    from the robbery?

17    A.   In a sense.  Like they wasted their time doing

18    whatever they did.  They were just upset.

19    Q.   You said that Animal had had a gun when they

20    got back.  Did he say where he got that gun from?

21    A.   He took it off the kid that died.

22    Q.   Did he seem proud of the gun that he had?

23    A.   Yeah, in a sense.  He didn't want nobody to

24    have the gun.  Him and E was arguing about who's

25    getting the gun and who's getting what.  They got --

1    they was going back and forth.  And I'm like -- I'm

2    like, y'all stupid, y'all tripping, like the fuck, like

3    excuse my language.  I'm like, what y'all doing, and it

4    was like a back and forth thing, and I'm just like --

5    because I have prior run-ins with the law.  I'm not

6    going to sit here and -- you know what I mean.  So I

7    know what comes with it.

8         So I'm like -- I mean, we came out for

9    something simple as to chill with Nikita and y'all do

10   this dumb shit.  And I felt like you put me in a

11   predicament, so, therefore, I didn't want to leave.  I

12   left the scene of a crime before when I was young and

13   got charged with conspiracy, so, therefore, I didn't

14   want no parts of it.  And I'm telling them, I'm not

15   leaving or just give me a ride or I'm staying the

16   night, Kita, and that's how it played out.

17        After a while, they got like teasing me in the

18   sense of, you bitchin', you bitchin'.  Call it what you

19   want.  I'm not leaving with y'all.  It got to the point

20   where I couldn't get a ride, and me the girl ended up

21   going back with them.  They went -- we went to his

22   house and Candice's house.  Me and the girl left,

23   started walking down the street.  They used to live --

24   they lived on Pike Street.  We walked to her aunt's

25   house.  She called the cab.  I dropped her off at her

1    house and I went home.

2        Q.   Do you know what they did after that?  Did they

3    ever tell you what they did with the truck or anything?

4        A.   Something to the sense of they wiped it down

5    with bleach and gave it back to Joe.

6        Q.   Do you know -- when you were leaving Reading

7    that night, do you know if either one of them had guns?

8        A.   Honestly, it's a normal thing where I'm from.

9    People carry guns all the time.  I carry guns when need

10   be.  It's something normal.  So it wasn't really a

11   concern of who had a gun because it's a normal thing.

12   I mean --

13       Q.   Do you know if one of them had a gun or not?

14       A.   I believe Animal did have a gun -- or yeah, I

15   don't remember who had a gun, but I'm pretty sure there

16   was a gun in the truck while we was going down.

17       Q.   Just one?

18       A.   I'm not sure.  It wasn't something I was too

19   concerned about.

20       Q.   Wasn't a big deal?  That was pretty normal?

21       A.   Yeah.

22       Q.   Just so that we're clear, the person you're

23   referring to as E, Eric Davis, do you see him in the

24   courtroom here today?

25       A.   Yes.

1      Q.   Could you point him out for the jury, please?

2      **A.   (Complies.)**

3           MR. BURD:  Let the record reflect, Your

4      Honor, he's indicating the defendant.

5           THE COURT:  What color shirt is he wearing?

6           THE WITNESS:  Baby blue, blue.

7           THE COURT:  Okay.  Let the record reflect,

8      the defendant has been identified.

9           MR. BURD:  May I have a moment to confer

10     please, Your Honor?

11          THE COURT:  Yes, sir.

12     BY MR. BURD:

13     Q.   I just have one more question, Mr. Mercado.

14     When they were talking about Animal going in through

15     the bathroom window, did they say anything specific

16     about how he did that?

17     **A.   It was something to the effect of they had to**

18     **push something out the window on the back porch or**

19     **something.  It was like plastic or cardboard or**

20     **something, something like that in the window.**

21     Q.   Thank you very much, Mr. Mercado.  I don't have

22     any further questions.  Attorney Smith may wish to ask

23     you some questions.

24          THE COURT:  Okay.  Attorney Smith, you may

25     cross.

1                    CROSS-EXAMINATION

2    BY MS. SMITH:

3        Q.   Okay.  So you said you've known Mr. Davis about

4    five years.  Did you know his girlfriend Candice as

5    well?

6        A.   Yes.

7        Q.   How long have you known her?

8        A.   I met Candice through him.

9        Q.   Okay.

10       A.   Through just being around him.

11       Q.   Did you spend time with her as well?

12       A.   Not really spend time.  She's been around while

13   I was there with E.

14       Q.   Okay.  So on that night -- or that day, what

15   time -- I think you said you guys left maybe around

16   12:00 or 1:00 for Reading?

17       A.   Yes, ma'am.

18       Q.   Were you hanging out with Mr. Davis earlier in

19   the day or did you just go over?

20       A.   I was with him earlier prior to that I believe.

21   We used to chill over at his house.  His house is like

22   a hang-out.

23       Q.   Okay.  So at some point you guys decided you

24   were going to drive to Allentown to see Nikita?

25       A.   Yes.

1      Q.   Okay.  And that was your understanding of why
2   you were going at that time?

3      A.   Yes.

4      Q.   Okay.  Since we're talking about the drive
5   there, I think you testified -- you said that you were
6   pretty sure there was a gun there.  You weren't that
7   concerned about it.  Did you see a gun in the car on
8   your way to Allentown?

9      A.   I'm not sure.

10      Q.   You don't remember or --

11      A.   I don't -- might have had a gun, might not
12   have.  It's a normal thing.

13      Q.   Okay.  So when you saw Animal later with the
14   silver firearm, he had said he had gotten that off the
15   victim?

16      A.   Yes.

17      Q.   And you never saw a firearm earlier?  You can't
18   remember if you saw a firearm earlier so you're really
19   not able to tell one way or the other?

20      A.   Yeah.  I don't know.

21      Q.   Okay.  So I think you said they spent about
22   maybe 10 or 20 minutes at Nikita's, and then they left
23   because Animal said he wanted to go talk to a friend?

24      A.   Mm-hmm.

25      Q.   Okay.  How long do you think they were gone?

1      A.   An hour, hour and a half.  It was a little

2   while.

3      Q.   Do you remember around what time you got to --

4   you left Reading around 12:00 or 1:00.  Do you remember

5   what time you had gotten to Allentown?

6      A.   I don't.  I might be wrong about the time when

7   we left.  It might have been later.  It might have been

8   earlier.

9      Q.   Okay.  Were you in touch with Nikita as you're

10   driving?

11      A.   Yes.

12      Q.   Okay.  You had a cell phone at the time?

13      A.   Yes.

14      Q.   Okay.  So they leave about 10 or 20 minutes

15   after you get there.  Did you notice at that time

16   whether either of them had a weapon on them?

17      A.   No.  It wasn't -- I was too worried about the

18   female.  She's a beautiful girl, and I was just, you

19   know what I mean, enjoying the company.

20      Q.   Okay.  So when they get back, do either of them

21   have blood or anything on them?

22      A.   No.

23      Q.   Okay.  How did this -- you know, how did it

24   come up?  Did you ask them where they were or did they

25   tell you right off the bat?  How did the -- how did it

1    come up in the conversation?

2        A.   It was more their mood.  They're just like --

3    this place just doing something and them coming in the

4    house like bragging about it.

5        Q.   Do you remember -- and I know you talk about

6    they.  Do you remember specifically whether it was

7    Animal or Eric who told you what happened in the house?

8        A.   It was both of them.

9        Q.   Both of them.  And the portion about the

10   window, that was Animal -- I guess you said -- that had

11   pushed in or pushed out whatever from the window to get

12   in?

13       A.   He said he pushed the window out and he let E

14   in.  They came in.  There was a boy on the couch.  E

15   watched the boy on the couch while Animal proceeded to

16   go into I guess a back room or another part of the

17   house, and however it played out, it played out in

18   there.

19       Q.   So you said that when they came back, they had

20   plastic bags --

21       A.   Yes.

22       Q.   -- with the K2.  Can you describe what kind of

23   bag it was?

24       A.   It was long, plastic, like, and I guess I want

25   to say industrial plastic, and it had like a seal at

1    the top of it or like a hole where somebody ripped the

2    hole with their hands.

3        Q.   Okay.  And all the -- there was K2 in the bag?

4        A.   It was multiple bags.  It was like four or five

5    big plastic bags.  I believe only one of them had K2 in

6    it.  The other ones was empty ones.

7        Q.   Okay.  And did they indicate to you that they

8    had gotten the bags at the house?

9        A.   Yes.

10       Q.   So you were upset.  You didn't want to ride

11   back with them because of the crime that had just been

12   committed?

13       A.   Yes, ma'am.

14       Q.   Okay.  But eventually you did decide to ride

15   back with them and that was just -- you ran out of

16   patience, just wanted to get home?

17       A.   Yeah.

18       Q.   Do you remember when exactly one or the other

19   of them told you about wiping down the truck?

20       A.   E told me the following day.

21       Q.   Okay.  So you saw him the next day?

22       A.   Yes.

23            THE COURT:  Who was that who told you?

24            THE WITNESS:  Eric.

25            THE COURT:  Okay.

1    BY MS. SMITH:

2        Q.   Do you remember where that was?

3        A.   Where he told me?

4        Q.   Mm-hmm.

5        A.   I don't know.  It was probably at his house

6    most likely.

7        Q.   Okay.  Did you go over to his house the next

8    day?

9        A.   I'm pretty sure.  The following day -- so it

10   was the next few coming days -- I believe it was the

11   next day.  I believe if -- I'm pretty sure it was.

12       Q.   Did you go with him to drop the Jeep back off

13   at the person that was the actual owner?

14       A.   No.

15       Q.   Okay.  At some point in time, detectives got in

16   touch with you about this case, correct?

17       A.   Yes, ma'am.

18       Q.   Okay.  When was the first time that they got in

19   touch with you about the case?

20       A.   They subpoenaed me for a grand jury.

21       Q.   Okay.  And did you appear before the grand

22   jury?

23       A.   No.  I spoke directly to these two detectives

24   right here.

25       Q.   Okay.  And you don't -- do you remember when

1    that was?  Can you give us an idea of the time?

2        A.   The time of day or the --

3        Q.   No.  The time of year.  When --

4        A.   It was a year later, two years later.  I don't

5    remember.

6        Q.   Okay.  And at the time that you talked -- how

7    many times did you talk to them?  Was that the only

8    time you talked to them or did you talk to them after

9    that?

10       A.   Them?  The detectives?

11       Q.   The detectives.

12       A.   I talked to them one time.

13       Q.   Okay.  And where did that conversation happen?

14       A.   I believe in this building.

15       Q.   Okay.  And so you actually sat down somewhere,

16   had a conversation with the detectives?

17       A.   Mm-hmm.

18       Q.   And at some point in time they actually start

19   recording your conversation, correct?

20       A.   Yes, ma'am.

21       Q.   Did you talk to them before the conversation

22   was recorded as well?

23       A.   Yes.

24       Q.   Okay.  Did you talk about the same thing you're

25   talking about now, the specifics of the case?

1      A.   In a sense.   I really don't remember.   It

2   happened years ago.   Memory gets worse and worse as

3   time goes on and it fades the situation.

4      Q.   Well, you seem to remember pretty well right

5   now.   Did the detectives refresh your recollection

6   about some of the facts of the case?

7      A.   No.   They didn't -- they let me do most of the

8   talking.   They asked me -- they wanted to put me in

9   front of the grand jury.   I told them, you don't have

10   to do that.   I'll talk -- answer whatever questions

11   y'all have.

12      Q.   Okay.   And then I think the DA pointed this

13   out.   You're actually facing charges right now

14   currently, correct?

15      A.   Yes, but that has nothing to do with -- I

16   wasn't even charged with no crimes at the time of me

17   speaking to these gentlemen.   I wasn't -- I had no

18   criminal charges.

19      Q.   Since that time, have any promises been made to

20   you regarding that case as far as your testimony here?

21      A.   No.

22      Q.   Are you hoping that your testimony here is

23   going to help you out in that case?

24      A.   No.   The case is petty.   I got possession of a

25   small -- marijuana, maybe a fine, and a simple assault,

1    harassment, and a year probation.  Whatever time --

2        Q.  You're not worried about it?

3        A.  Not too much.

4        Q.  So don't think you need the detectives to help

5    you out on it?

6        A.  No.  I didn't ask them to help me.

7            MS. SMITH:  Could I just have one second,

8    Judge?

9    BY MS. SMITH:

10       Q.  Let me just ask you one more -- a couple more

11   questions about the gun.  So the weapon that you saw

12   that they brought that was supposedly Animal's, do you

13   know what kind of weapon it was?

14       A.  I don't.

15       Q.  Okay.  A handgun versus a, you know, a rifle or

16   a shotgun?  Like it wasn't a long gun?

17       A.  The gun that they brought?

18       Q.  Yeah, that Animal showed.

19       A.  I'm not sure if -- no, the gun that Animal

20   brought was the gun -- the gun that I seen was a silver

21   dull gun that was the boy who was shot.

22       Q.  Okay.  But it was a handgun.  It was not a --

23       A.  Yes, it was a handgun.

24       Q.  -- a rifle or anything like that.  And was it a

25   -- were you able to tell the, you know, the caliber or

1    anything like that?  Are you familiar with guns?

2         **A.   Yeah.  It was a 45 Smith & Wesson.**

3         Q.   And you -- as far as the weapon that Animal had

4    taken, that you don't remember, not sure what it would

5    have been or a weapon that would have come along for

6    them.  You never saw that other gun.  You only saw the

7    weapon that was supposedly taken from the victim?

8         **A.   Yes.**

9         Q.   Okay.  All right.

10              MS. SMITH:  I have no other questions.

11              THE COURT:  Redirect?

12              MR. BURD:  No, Your Honor.

13              THE COURT:  Okay.  Mr. Mercado, you may step

14   down and you're free to go.  Okay.  Mr. Burd, you may

15   call your next witness.

16              MR. BURD:  The Commonwealth will next call

17   Detective Mark Garrett.

18              THE COURT:  Detective Garrett, if you'd

19   please come forward, and when you get to the witness

20   box, please remain standing while the oath is

21   administered.

22              MARK A. GARRETT, having been called as a

23   witness, was duly sworn, examined, and testified as

24   follows:

25              THE COURT:  Please be seated.  Okay.

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF LEHIGH



**Commitment**

| Mag. Dist. No: | MDJ-31-1-02 |
| MDJ Name: | Honorable Rashid Santiago |
| Address: | 1101 West Hamilton Street Suite 150 Allentown, PA 18101 |
| Telephone: | 610-432-8700 |

Commonwealth of Pennsylvania
v.
Eric Monroe Davis

Lehigh County Jail
38 N 4th St
Allentown, PA 18102

Docket No:   MJ-31102-CR-0000250-2016
Case Filed:   6/3/2016

Kate Smith
Attorney - Public Defender's office
(610) 782-3157

### Charge(s)

| 18 § 2501 §§ A (Lead) | Criminal Homicide |
| 18 § 3701 §§ A1I | Robbery-Inflict Serious Bodily Injury |
| 18 § 3502 §§ A1 | Burglary - Overnight Accommodation, Person Present |

To ANY AUTHORIZED PERSON of the named County of this Commonwealth:
You are hereby commanded to convey and deliver into the custody of the Keeper of Lehigh County Jail the following named person. You, the Keeper, are required to receive the person into your custody to be safely kept by you until discharged by due course of law for:

Eric Monroe Davis

OTN/LOTN:   X 026365-3/X 026366-3
DOB:   06/08/1981
SSN:   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

A Preliminary Hearing has been scheduled for the above captioned case to be held on/at:

| Date: **Friday, June 10, 2016** | Place: Lehigh County Central Court: MDJ-31-0-01 Lehigh County Courthouse 455 West Hamilton Street Allentown, PA 18101 610-782-3229 |
| Time: **2:00 PM** | |

Commitment Reason:   Bail Denied
Commitment Start:   06/03/2016

June 03, 2016
Date

Robert C. Halal
Magisterial District Judge Robert C. Halal

**If you are disabled and require a reasonable accommodation to gain access to the Magisterial District Court and its services, please contact the Magisterial District Court at the above address or telephone number. We are unable to provide transportation.**

Commonwealth of Pennsylvania
           v.
Eric Monroe Davis

Docket No.: MJ-31102-CR-0000250-2016

## All Charge(s)

| | |
|---|---|
| 18 § 2501 §§ A (Lead) | Criminal Homicide |
| 18 § 3701 §§ A1I | Robbery-Inflict Serious Bodily Injury |
| 18 § 3502 §§ A1 | Burglary - Overnight Accommodation, Person Present |
| 18 § 2702 §§ A1 | Aggravated Assault |
| 18 § 903 | Conspiracy - Criminal Homicide |
| 18 § 903 | Conspiracy - Burglary - Overnight Accommodation, Person Present |
| 18 § 903 | Conspiracy - Aggravated Assault |
| 18 § 903 | Conspiracy - Robbery-Inflict Serious Bodily Injury |

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF LEHIGH



**Preliminary Hearing Notice**

| Mag. Dist. No: | MDJ-31-1-02 |
| MDJ Name: | Honorable Rashid Santiago |
| Address: | 1101 West Hamilton Street Suite 150 Allentown, PA 18101 |
| Telephone: | 610-432-8700 |

Commonwealth of Pennsylvania
v.
Eric Monroe Davis

Eric Monroe Davis
NCA
Allentown, PA 18102

Docket No: MJ-31102-CR-0000250-2016
Case Filed: 6/3/2016
Comp/Clt #: 14117108
OTN/LOTN: X 026365-3/X 026365-3

| Charge(s) | |
|---|---|
| 18 § 2501 §§ A (Lead) | Criminal Homicide |
| 18 § 3701 §§ A1I | Robbery-Inflict Serious Bodily Injury |
| 18 § 3502 §§ A1 | Burglary - Overnight Accommodation, Person Present |

A Preliminary Hearing has been scheduled for the above captioned case to be held on/at:

| Date: Friday, June 10, 2016 | Place: Lehigh County Central Court: MDJ-31-0-01 Lehigh County Courthouse 455 West Hamilton Street Allentown, PA 18101 610-782-3229 |
| Time: 2:00 PM | |

**Notice To Defendant**

A complaint has been filed charging you with the offense(s) set forth above and on the attached copy of the complaint. If you fail to appear at the time and place above without cause, you will be deemed to have waived your right to be present at any further proceedings before the Magisterial District Judge and the case will proceed in your absence. If any of the charges against you are held for court, a request for a bench warrant against you will be transmitted to the Court of Common Pleas.
At the preliminary hearing you may:
1. Be represented by counsel;
2. Cross-examine witnesses and inspect physical evidence offered against you;
3. Call witnesses on your behalf other than witnesses to testify to your good reputation only, offer evidence on your behalf and testify;
4. Make written notes of the proceeding, or have your counsel do so, or make a stenographic, mechanical, or electronic record of the proceedings.

If the case is held for court and if you fail to appear without cause at any proceeding for which your presence is required, including trial, your absence may be deemed a waiver of your right to be present, and the proceeding, including the trial, may be conducted in your absence.

If you cannot afford to hire an attorney, one may be appointed to represent you. Please contact the office of the Magisterial District Judge for additional information regarding the appointment of an attorney. If you have any questions, please call the above office immediately.
Should you fail to appear for your preliminary hearing, a warrant will be issued for your arrest.

June 03, 2016

Robet C. Halal

Date

Magisterial District Judge Robert C. Halal

If you are disabled and require a reasonable accommodation to gain access to the Magisterial District Court and its services, please contact the Magisterial District Court at the above address or telephone number. We are unable to provide transportation. You can make case payments online through Pennsylvania's Unified Judicial System web portal. Visit the portal at http://ujsportal.pacourts.us to make a payment.

Si usted necesita un intérprete, llame al tribunal inmediatamente al teléfono listado arriba.

| All Charge(s) | |
|---|---|
| 18 § 2501 §§ A (Lead) | Criminal Homicide |
| 18 § 3701 §§ A1! | Robbery-Inflict Serious Bodily Injury |
| 18 § 3502 §§ A1 | Burglary - Overnight Accommodation, Person Present |
| 18 § 2702 §§ A1 | Aggravated Assault |
| 18 § 903 | Conspiracy - Criminal Homicide |
| 18 § 903 | Conspiracy - Burglary - Overnight Accommodation, Person Present |
| 18 § 903 | Conspiracy - Aggravated Assault |
| 18 § 903 | Conspiracy - Robbery-Inflict Serious Bodily Injury |

Si usted necesita un intérprete, llame al tribunal inmediatamente al teléfono listado arriba.

| COMMONWEALTH OF PENNSYLVANIA | | POLICE CRIMINAL COMPLAINT COMMONWEALTH OF PENNSYLVANIA VS. |
|---|---|---|

COUNTY OF: Lehigh

Magisterial District Number: District 1-2
MDJ: Hon. District 31-1-02
Address: 1101 Hamilton Street, Suite 150
Allentown, PA 18102
Telephone: (610) 432-8700

**DEFENDANT:** (NAME and ADDRESS):
ERIC MONROE DAVIS
First Name   Middle Name   Last Name   Gen.
NO CURRENT ADDRESS

**NCIC Extradition Code Type**

- [x] 1-Felony Full
- [ ] 2-Felony Ltd.
- [ ] 3-Felony Surrounding States
- [ ] 4-Felony No Ext.
- [ ] 5-Felony Pend.
- [ ] A-Misdemeanor Full
- [ ] B-Misdemeanor Limited
- [ ] C-Misdemeanor Surrounding States
- [ ] D-Misdemeanor No Extradition
- [ ] E-Misdemeanor Pending
- [ ] Distance: ___

**DEFENDANT IDENTIFICATION INFORMATION**

| Docket Number | Date Filed | OTN/LiveScan Number | Complaint/Incident Number | SID | Request Lab Services? |
|---|---|---|---|---|---|
| CR-250-16 | 05/02/16 | X 026365-3 | 14117108 | 24186920 | ☐ YES ☐ NO |

| GENDER | DOB 6/8/81 | POB PA | | Add'l DOB / / | Co-Defendant(s) ☐ |
|---|---|---|---|---|---|
| ☑ Male | First Name | | Middle Name | Last Name | Gen. |
| ☐ Female | AKA | | | | |

| RACE | ☑ White | ☐ Asian | ☑ Black | ☐ Native American | ☐ Unknown |
|---|---|---|---|---|---|
| ETHNICITY | ☐ Hispanic | ☑ Non-Hispanic | | | ☐ Unknown |

| HAIR COLOR | ☐ GRY (Gray) | ☐ RED (Red/Aubn.) | ☐ SDY (Sandy) | ☐ BLU (Blue) | ☐ PLE (Purple) | ☐ BRO (Brown) |
|---|---|---|---|---|---|---|
| | ☑ BLK (Black) | ☐ ONG (Orange) | ☐ WHI (White) | ☐ XXX (Unk./Bald) | ☐ GRN (Green) | ☐ PNK (Pink) |
| | ☐ BLN (Blonde / Strawberry) | | | | | |

| EYE COLOR | ☐ BLK (Black) | ☐ BLU (Blue) | ☑ BRO (Brown) | ☐ GRN (Green) | ☐ GRY (Gray) |
|---|---|---|---|---|---|
| | ☐ HAZ (Hazel) | ☐ MAR (Maroon) | ☐ PNK (Pink) | ☐ MUL (Multicolored) | ☐ XXX (Unknown) |

| Driver License | State PA | License Number 26698354 | Expires 06/09/2016 | WEIGHT (lbs.) |
|---|---|---|---|---|
| DNA | ☐ YES ☐ NO | DNA Location | | 180 |
| FBI Number 648872AC1 | | MNU Number | | Ft. HEIGHT In. |
| Defendant Fingerprinted | ☐ YES ☐ NO | | | 5   10 |
| Fingerprint Classification: | | | | |

**DEFENDANT VEHICLE INFORMATION**

| | State | Hazmat | Registration Sticker (MM/YY) | Comm'l Veh. Ind. | School Veh. | Oth. NCIC Veh. Code | Reg. same as Def. |
|---|---|---|---|---|---|---|---|
| Plate # | | ☐ | / | ☐ | ☐ | | |
| VIN | | Year | Make | Model | Style | Color | ☐ |

Office of the attorney for the Commonwealth ☑ Approved ☐ Disapproved because:

(The attorney for the Commonwealth may require that the complaint, arrest warrant affidavit, or both be approved by the attorney for the Commonwealth prior to filing. See Pa.R.Crim.P. 507).

_James P. Martin_ _(signature)_ _6 Dec 2016_
(Name of the attorney for the Commonwealth)   (Signature of the attorney for the Commonwealth)   (Date)

I, DAMIAN MURRAY AND ERIK LANDIS    Badge 81/36562 and Badge 129/29975,
(Name of the Affiant)    (PSP/MPOETC -Assigned Affiant ID Number & Badge #)

of Allentown Police Department - Allentown, PA    PA0390100
(Identify Department or Agency Represented and Political Subdivision)    (Police Agency ORI Number)

do hereby state: (check appropriate box)

1. ☑ I accuse the above named defendant who lives at the address set forth above
   ☐ I accuse the defendant whose name is unknown to me but who is described as _____

   ☐ I accuse the defendant whose name and popular designation or nickname are unknown to me and whom I have therefore designated as John Doe or Jane Doe
   with violating the penal laws of the Commonwealth of Pennsylvania at [301 ]    940 WEST PINE ST APARTMENT
   (Subdivision Code)    (Place - Political Subdivision)
   ALLENTOWN PA 18102

   in Lehigh County    [ 39 ]    on or about DECEMBER 9, 2014 AT APPROXIMATELY 0355 HOURS
   (County Code)

## POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed:<br>06 /02/ 16 | OTN/LiveScan Number | Complaint/Incident Number<br>14117108 |
|---|---|---|---|
| Defendant Name | First:<br>ERIC | Middle:<br>MONROE | Last:<br>DAVIS |

The acts committed by the accused are described below with each Act of Assembly or statute violated, if appropriate. When there is more than one offense, each offense should be numbered chronologically.

| Inchoate Offense | ☐ Attempt 18 901 A | | ☐ Solicitation 18 902 A | | | | ☐ Conspiracy 18 903 | |
|---|---|---|---|---|---|---|---|---|

| ☐ | 1 | 2501 | (a) | of the | PACC | 1 | | | |
|---|---|---|---|---|---|---|---|---|---|
| Lead? | Offense# | Section | Subsection | | PA Statue (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |
| PennDOT Data (if applicable) | | Accident Number | | | | ☐ Safety Zone | | | ☐ Work Zone |

Statute Description (include the name of statute or ordinance):
**Criminal Homicide**

| Inchoate Offense | ☐ Attempt 18 901 A | | ☐ Solicitation 18 902 A | | | | ☐ Conspiracy 18 903 | |
|---|---|---|---|---|---|---|---|---|

| ☐ | 2 | 3701 | (a)(1)(i) | of the | PACC | 1 | F1 | | |
|---|---|---|---|---|---|---|---|---|---|
| Lead? | Offense# | Section | Subsection | | PA Statue (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |
| PennDOT Data (if applicable) | | Accident Number | | | | ☐ Safety Zone | | | ☐ Work Zone |

Statute Description (include the name of statute or ordinance):
**Robbery - inflicts serious bodily injury**

| Inchoate Offense | ☐ Attempt 18 901 A | | ☐ Solicitation 18 902 A | | | | ☐ Conspiracy 18 903 | |
|---|---|---|---|---|---|---|---|---|

| ☐ | 3 | 3502 | [a][1] | of the | PACC | 1 | F1 | | |
|---|---|---|---|---|---|---|---|---|---|
| Lead? | Offense# | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |
| PennDOT Data (if applicable) | | Accident Number | | | | ☐ Safety Zone | | | ☐ Work Zone |

Statute Description (include the name of statute or ordinance):
**Burglary**

Set forth a brief summary of the facts sufficient to advise the defendant of the nature of the offense(s) charged. A citation to the statute(s) violated, without more, is not sufficient. In a summary case, you must cite the specific section(s) and subsection(s) of the statute(s) or ordinance(s) allegedly violated. The age of the victim at the time the offense may be included if known. In addition, social security numbers and financial information (e.g. PINs) should not be listed. If the identity of an account must be established, list only the last four digits. 204 PA.Code §§ 213.1 - 213.7.

Acts of the accused:
Description of charge(s) on addition page.

## 🏛 CRIMINAL COMPLAINT

| Docket Number: | Date Filed: 06 /02/ 16 | | OTN/LiveScan Number | | Complaint/Incident Number 14117108 |
|---|---|---|---|---|---|
| Defendant Name: | First: ERIC | | Middle: MONROE | Last: DAVIS | |

**1.  2501.(a)**
IN THAT, on or about said date, THE DEFENDANT did intentionally, knowingly, recklessly, or negligently cause the death of JOSE CARRERO, another human being, in violation of Section 2501(a) of the PA Crimes Code.

**2.  3701.(a)(1)(i).F1**
IN THAT, on or about said date, THE DEFENDANT, in the course of committing a theft, namely THE THEFT OF SYNTHETIC MARIJUANA, US CURRENCY AND A .45 CALIBER HANDGUN, did inflict serious bodily injury upon another, namely JOSE CARRERO AND JOSE MORALES, in violation of Section 3701(a)(1)(i) of the PA Crimes Code.

**3.  3502.[a][1].F1**
A person commits the offense of burglary if, with the intent to commit a crime therein, the person enters a building or occupied structure, or separately secured or occupied portion thereof that is adapted for overnight accommodations in which at the time of the offense any person is present.

## POLICE CRIMINAL COMPLAINT

| Docket Number: | Data Filed: 06 /02/ 16 | OTN/LivaScan Number | Complaint/Incident Number 14117108 |
|---|---|---|---|
| Defendant Name | First: ERIC | Middle: MONROE | Last: DAVIS |

The acts committed by the accused are described below with each Act of Assembly or statute violated, if appropriate. When there is more than one offense, each offense should be numbered chronologically.

| Inchoate Offense | ☐ Attempt 18 901 A | | | ☐ Solicitation 18 902 A | | | ☐ Conspiracy 18 903 | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ Lead? Offense | 4 | 2702 Section | (a)(1) Subsection | ☑ of this PA Statute (Title) PACC | 1 Counts | F1 Grade | NCIC Offense Code | | UCR/NIBRS Code | |
| PennDOT Data (if applicable) | | Accident Number | | | ☐ Safety Zone | | | ☐ Work Zone | | |

Statute Description (include the name of statute or ordinance):
**Aggravated Assault - Knowingly or Recklessly Extreme Indiffe**

| Inchoate Offense | ☐ Attempt 18 901 A | | | ☐ Solicitation 18 902 A | | | ☐ Conspiracy 18 903 | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ Lead? Offense | 5 | 903 Section | (a)(1) Subsection | ☑ of this PA Statute (Title) PACC | 4 Counts | Grade | NCIC Offense Code | | UCR/NIBRS Code | |
| PennDOT Data (if applicable) | | Accident Number | | | ☐ Safety Zone | | | ☐ Work Zone | | |

Statute Description (include the name of statute or ordinance):
**Criminal Conspiracy**

| Inchoate Offense | ☐ Attempt 18 901 A | | | ☐ Solicitation 18 902 A | | | ☐ Conspiracy 18 903 | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ Lead? Offense | | Section | Subsection | ☐ of this PA Statute (Title) | Counts | Grade | NCIC Offense Code | | UCR/NIBRS Code | |
| PennDOT Data (if applicable) | | Accident Number | | | ☐ Safety Zone | | | ☐ Work Zone | | |

Statute Description (include the name of statute or ordinance):

Set forth a *brief* summary of the facts sufficient to advise the defendant of the nature of the offense(s) charged. A citation to the statute(s) violated, without more, is not sufficient. In a summary case, you must cite the specific section(s) and subsection(s) of the statute(s) or ordinance(s) allegedly violated. The age of the victim at the time of the offense may be included if known. In addition, social security numbers and financial information (e.g. PINs) should not be listed. If the identity of an account must be established, list only the last four digits. 204 PA Code §§ 213.1 – 213.7.

Acts of the accused:
Description of charge(s) on addition page.

 **CRIMINAL COMPLAINT**

| Docket Number: | Date Filed: 06 /02/ 16 | OTN/LiveScan Number | Complaint/Incident Number 14117108 |
|---|---|---|---|
| Defendant Name: | First ERIC | Middle: MONROE | Last: DAVIS |

4. 2702.(a)(1).F1

IN THAT, on or about said date, THE DEFENDANT did attempt to cause or did intentionally, knowingly or recklessly cause serious bodily injury to JOSE MORALES under circumstances manifesting extreme indifference to the value of human life, that is to say THE DEFENDANT did PISTOL WHIP JOSE MORALES IN THE HEAD AND CONSPIRE WITH "JOHN DOE" TO SHOOT JOSE MORALES IN THE LEG, in violation of Section 2702(a)(1) of the PA Crimes Code.

5.0. 903.(a)(1)

IN THAT, on or about said date, THE DEFENDANT, with the intent of promoting or facilitating the crime of HOMICIDE, did conspire and agree with "JOHN DOE" that they or one or more of them would engage in conduct constituting such crime or an attempt or solicitation to commit such crime, and in furtherance thereof, did commit the act's) of HOMICIDE, in violation of Section 903(a)(1) of the PA Crimes Code.

5.1. 903.(a)(1)

IN THAT, on or about said date, THE DEFENDANT, with the intent of promoting or facilitating the crime of ROBBERY, did conspire and agree with "JOHN DOE" that they or one or more of them would engage in conduct constituting such crime or an attempt or solicitation to commit such crime, and in furtherance thereof, did commit the act's) of ROBBERY, in violation of Section 903(a)(1) of the PA Crimes Code.

5.2. 903.(a)(1)

IN THAT, on or about said date, THE DEFENDANT, with the intent of promoting or facilitating the crime of BURGLARY, did conspire and agree with "JOHN DOE" that they or one or more of them would engage in conduct constituting such crime or an attempt or solicitation to commit such crime, and in furtherance thereof, did commit the act's) of BURGLARY, in violation of Section 903(a)(1) of the PA Crimes Code.

5.3. 903.(a)(1)

IN THAT, on or about said date, THE DEFENDANT, with the intent of promoting or facilitating the crime of AGGRAVATED ASSAULT, did conspire and agree with "JOHN DOE" that they or one or more of them would engage in conduct constituting such crime or an attempt or solicitation to commit such crime, and in furtherance thereof, did commit the act's) of AGGRAVATED ASSAULT, in violation of Section 903(a)(1) of the PA Crimes Code.

## 🏛 POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed: 06 /02/ 16 | OTN/LiveScan Number | | Complaint/Incident Number 14117108 |
|---|---|---|---|---|
| Defendant Name | First: ERIC | Middle: MONROE | Last: DAVIS | |

2. I ask that a warrant of arrest or a summons be issued and that the defendant be required to answer the charges I have made.

3. I verify that the facts set forth in this complaint are true and correct to the best of my knowledge or information and belief. This verification is made subject to the penalties of Section 4904 of the Crimes Code (18 Pa.C.S. § 4904) relating to unsworn falsification to authorities.

4. This complaint consists of the preceding page(s) numbered _1_ through _6_.

The acts committed by the accused, as listed and hereafter, were against the peace and dignity of the Commonwealth of Pennsylvania and were contrary to the Act(s) of the Assembly, or in violation of the statutes cited. **(Before a warrant of arrest can be issued, an affidavit of probable cause must be completed, sworn to before the issuing authority, and attached.)**

|   June 02, 2016   |     |
|---|---|
| (Date) | (Signature of Affiant) |

AND NOW, on this date ___June 2, 2016___  I certify that the complaint has been properly completed and verified.

An affidavit of probable cause must be completed before a warrant can be issued.

| _____ (Magisterial District Court Number) | _____ (Issuing Authority) | SEAL |
|---|---|---|

## POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed: 06 / 02/ 16 | OTN/LiveScan Number | Complaint/Incident Number 14117108 |
|---|---|---|---|
| Defendant Name: | First: ERIC | Middle: MONROE | Last: DAVIS |

## AFFIDAVIT of PROBABLE CAUSE

1. Your Affiants are duly sworn officers with the City of Allentown Police Department. Detective Damian Murray is currently assigned to the Vice and Intelligence Unit. Detective Erik Landis is currently assigned to the Criminal Investigations Division and is also assigned to the Lehigh County District Attorney's Homicide Task Force.

2. On December 9, 2014 at approximately 0355 hours, the Allentown 911 center received a phone call from a male asking for help. The male went on to say that he and another male had been shot inside of 940 West Pine Street Apartment 1 Allentown PA 18102.

3. Allentown Police Patrol Units arrived at 940 West Pine Street they located Jose Morales suffering from a gunshot wound to his left leg. Police also located another male inside of the apartment, later identified as Jose Carrero, suffering from a gunshot wound to his chest. Carrero would later be pronounced dead on scene by the Lehigh County Coroner's Office. The manner of death would be ruled a homicide.

4. Jose Morales would be transported to Lehigh Valley Hospital Cedar Crest for treatment of his injuries.

5. Jose Morales was interviewed at the hospital and stated that he was sleeping on the living room floor of the apartment and was woken up by an unknown male striking him in the head with a hard object, believed to be a handgun. Morales was able to get up from the floor and observed two unknown males inside of the apartment both armed with handguns.

6. Morales stated that there was a struggle between him and the male that initially hit him. He stated that, during this struggle, he heard numerous gunshots and observed the second male pointing a handgun and shooting in the direction of the bedroom where Jose Carrero had been sleeping.

7. Morales stated that after the gunshots were heard, the males began demanding money and drugs from Morales. Morales told the males that he didn't know where anything was and Morales was subsequently shot in the left leg by the male that had fired the shots in the direction of Jose Carrero's bedroom.

8. Morales reported that the two males grabbed an unknown quantity of synthetic marijuana and US Currency prior to fleeing the apartment through the rear door. It would later be discovered that a .45 caliber Taurus handgun was also stolen from inside of the residence. Morales believed that these males would have either had to force entry through the rear door of the apartment

I, DAMIAN MURRAY AND ERIK LANDIS, BEING DULY SWORN ACCORDING TO THE LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

(Signature of Affiant)

Sworn to me and subscribed before me this ___2nd___ day of ___June___ ___2016___

Date ___Kelly L Banach___ , Magisterial District Judge

My commission expires first Monday of January, 1, 2024

SEAL.

## 🏛 POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed: 06 /02/ 15 | OTN/LiveScan Number | Complaint/Incident Number 14117108 |
| --- | --- | --- | --- |
| Defendant Name: | First ERIC | Middle: MONROE | Last: DAVIS |

### AFFIDAVIT of PROBABLE CAUSE

or climb in through the bathroom window which was located next to the kitchen. There were no indications that force was used to enter the rear door of the apartment.

9. A search warrant was obtained and executed on 940 West Pine Street Apartment 1 in reference to this investigation. A black knit hat was located in the kitchen area which was determined not to belong to any of the occupants of the apartment.

10. This knit hat would subsequently be submitted to the Pennsylvania State Police Lab for analysis. Two DNA profiles were located on the knit hat were found to return to the listed defendant and an individual who is known to Your Affiants but identified in this affidavit as Witness 1. The listed defendant would admit to Your Affiants that this hat did belong to him but claimed that he loaned the hat to an unknown person.

11. Witness 1 was interviewed and stated that he/she heard the listed defendant and another male who is known to Your Affiants but identified in this document as "John Doe" speaking about a shooting which had occurred in Allentown PA. Witness 1 reported that the listed defendant and "John Doe" were talking about having to climb through a window and that there was some sort of struggle inside of an apartment. Witness 1 stated that the listed defendant would later tell Witness 1 that this conversation was about "one person getting shot and one person getting killed."

12. Witness 1 was able to identify phone numbers for "John Doe" and the listed defendant. Call Detail Records and location services were obtained for these phone numbers and the phones were shown leaving Reading Pennsylvania shortly before midnight on December 8, 2014 and traveling to Allentown Pennsylvania. The phones were located within Allentown Pennsylvania prior to traveling back to Reading Pennsylvania at approximately 0400 hours on December 9, 2014.

13. Witness 1 was also able to provide information related to a possible vehicle being used to transport the listed defendant and "John Doe" to Allentown. This vehicle would be identified as a blue Jeep Cherokee and the registered owner of the vehicle at the time of the homicide was located and interviewed. This individual is known to Your Affiants but is identified in this document as Witness 2.

14. Witness 2 reported that he/she loaned a blue Jeep Cherokee to the listed defendant around the time of December 9, 2014. Witness 2 stated that the listed defendant returned the vehicle the following day and also stated that the vehicle smelled of bleach and was extremely clean upon returning it. Witness 2 stated that the vehicle was returned later the same day to the

I, DAMIAN MURRAY AND ERIK LANDIS _____ , BEING DULY SWORN ACCORDING TO THE LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

_(Signature of Affiant)_

Sworn to me and subscribed before me this ___2nd___ day of ___June___ ___2016___

Date ___Kelly Banach___ ___Magisterial District Judge___

My commission expires first Monday of January, 1, 2024

SEAL

## POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed: 06 /02/ 16 | | OTN/LiveScan Number | | Complaint/Incident Number 14117108 |
|---|---|---|---|---|---|
| Defendant Name: | First: ERIC | | Middle: MONROE | | Last DAVIS |

## AFFIDAVIT of PROBABLE CAUSE

dealership.

15. Your Affiants were able to locate the dealership where the vehicle was returned and received information that a GPS tracking device had been installed in the vehicle in the event that the owner defaulted on payments. The GPS information was obtained and showed that the blue Jeep Cherokee was in Allentown PA within the time frame of the homicide.

16. Another individual who is known to Your Affiants but identified in this affidavit as Witness 3 was interviewed and provided additional information related to this ongoing investigation.

17. Witness 3 stated that he/she drove with the listed defendant and "John Doe" from Reading Pennsylvania to Allentown Pennsylvania around December 9, 2014. Witness 3 stated that they stayed at a residence in the area while the listed defendant and "John Doe" left the same residence. Witness 3 stated that the listed defendant and "John Doe" were gone for approximately 1 hour and upon returning to the residence were in possession of an unknown amount of US Currency and an unknown quantity of synthetic marijuana.

18. According to Witness 3, "John Doe" was also in possession of a silver .45 caliber handgun. Witness 3 stated that "John Doe" and the listed defendant told them that "John Doe" climbed in through a bathroom window and opened the back door to allow the listed defendant to enter the apartment. Witness 3 stated that they were told that "John Doe" and the listed defendant located a male sleeping on the floor and a struggle ensued between this male and the listed defendant. During the struggle, a shooting occurred and "John Doe" told them that he shot in the direction of a male in the bedroom. Witness 3 also stated that they were told that another male was shot in the leg inside of the apartment.

19. Witness 3 reported that "John Doe" and the listed defendant told them that they had gone to the apartment in an attempt to steal synthetic marijuana and US Currency.

20. Another individual who is known to Your Affiants but identified in this affidavit as Witness 4 was interviewed and provided additional information related to this ongoing investigation.

21. Witness 4 stated that "John Doe", the listed defendant, and Witness 3 did arrive at a residence in Allentown Pennsylvania around the date of December 9, 2014. Witness 4 stated that at some point during the early morning hours, "John Doe" and the

I, DAMIAN MURRAY AND ERIK LANDIS                    , BEING DULY SWORN ACCORDING TO THE LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

(Signature of Affiant)

Sworn to me and subscribed before me this ___2nd___ day of ___June___ ___2016___

Date ___Kelly C Banach___     , Magisterial District Judge

My commission expires first Monday of January. 1, 2024

SEAL

**POLICE CRIMINAL COMPLAINT**

| Docket Number: | Date Filed: 06 /02/ 16 | OTN/LiveScan Number | Complaint/Incident Number 14117108 |
|---|---|---|---|
| Defendant Name: | First: ERIC | Middle: MONROE | Last: DAVIS |

## AFFIDAVIT of PROBABLE CAUSE

listed defendant left the residence.  Witness 4 confirmed that statements which were provided independently by Witness 3.

I, DAMIAN MURRAY AND ERIK LANDIS_____, BEING DULY SWORN ACCORDING TO THE LAW,
DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT
TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

_____
(Signature of Affiant)

Sworn to me and subscribed before me this _____ day of

_____                                          _____
        Date                                                         , Magisterial District Judge

My commission expires  first Monday of January,

SEAL

AOPC 411C – Rev. 07/10                                                                 Page 1 of ___